Colin Cloud Hampson
champson@sonoskysd.com
California Bar No. 174184
Sonosky, Chambers, Sachse,
Endreson & Perry, LLP
145 Willow Road, Suite 200
Bonita, CA 91902
Telephone: (619) 267-1306

Steve Bodmer
sbodmer@pechanga-nsn.gov
California Bar No. 257123
Pechanga Band of Indians
12705 Pechanga Road
Temecula, California 92593
Telephone: (951) 770-6171

*Attorneys for Plaintiff Pechanga Band of Indians*

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PECHANGA BAND OF INDIANS, a federally recognized Indian tribe, 12705 Pechanga Road, Temecula, CA 92592, | |
| Plaintiff, | Case No. 5:25-cv-03605 |
| v. | **VERIFIED COMPLAINT (Civil Action, 25 U.S.C. § 5331)** |
| ROBERT F. KENNEDY, JR., Secretary, United States Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, DC 20201; | |

| | |
|---|---|
| CLAYTON FULTON, Chief of Staff, United States Indian Health Service, 5600 Fishers Lane, Rockville, MD 20857; | ) |
| BEVERLY MILLER, Area Director, California Area Indian Health Service, 650 Capitol Mall, Suite 7-100, Sacramento, CA 95814; and | ) |
| WESLEY SIMMONS, Area Lead Negotiator, California Area Indian Health Service, 650 Capitol Mall, Suite 7-100, Sacramento, CA 95814, | ) |
| Defendants. | |

Plaintiff, the Pechanga Band of Indians (Pechanga, Tribe, or Band), complains and alleges as follows:

**<u>JURISDICTION</u>**

1. The Court has jurisdiction over this action pursuant to 25 U.S.C. §§ 5331, 5391; 28 U.S.C. § 1331; and 28 U.S.C. § 2201.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the actions and events giving rise to the claims occurred within this judicial district.

## INTRODUCTION AND BRIEF STATEMENT OF THE CASE

3. This action seeks to reverse the Indian Health Service's (IHS) unlawful rejection of the Tribe's final offer proposing to establish an opioid treatment facility for its members under the Indian Self-Determination and Education Assistance Act (ISDA or the Act), 25 U.S.C. §§ 5301-5423.[1] The Tribe seeks injunctive relief compelling IHS to award the proposed compact and funding agreement to the Tribe as required by the ISDA.

4. The ISDA was enacted in 1975 to reverse "the prolonged Federal domination of Indian service programs," which had "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities." § 5301(a)(1). It established a "meaningful Indian self-determination policy" with the goal of transitioning away "from the Federal domination of programs" serving Indians "to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." § 5302.

5. In short (and in the IHS context), the ISDA authorizes a tribe to receive federal funds to serve eligible IHS beneficiaries. The ISDA contemplates the

[1] All code citations are to Title 25 of the United States Code unless otherwise indicated.

transfer of an IHS program to a tribe either through a Title I contract (§§ 5321-5332) or a Title V compact (§§ 5381-5399). As compared to Title I, Title V provides tribal compactors with additional statutory protections and flexibility to design and manage programs as the tribe deems best. This case concerns a proposed Title V compact.

6. IHS is authorized to, and does, provide opioid treatment services for tribal members across the country. IHS has also authorized other tribal programs to provide opioid treatment services for both Native and non-Native patients under the ISDA. Opioid treatment services are therefore generally compactible by a tribe under the ISDA.

7. The opioid treatment facility that Pechanga proposes to operate under an ISDA compact would allow the Tribe to provide desperately needed services to its members, promoting tribal self-determination and improving the health of its tribal community.

8. Pechanga has proposed funding the proposal in part with a small portion of the funds that IHS currently awards to a local intertribal health organization of which the Tribe is a member. The proposal thus would require *no* additional program funding from IHS. That intertribal organization supports the proposed repurposing of these funds.

9. On July 3, 2025, IHS rejected the Tribe's final offer to compact for the proposed opioid treatment facility.

10. The ISDA outlines four specific bases upon which IHS may reject a final offer to award a compact; outside of these narrow justifications, IHS is legally required to accept a tribe's final offer. § 5387(c).

11. IHS provided three reasons for its rejection of the Tribe's final offer: (1) IHS alleges that the opioid treatment program would not sufficiently benefit Native patients and is therefore illegal (even though it would be open to all Pechanga members and other Indians in the region); (2) IHS alleges the Tribe requested too much federal program funding (even though the Tribe did not request *any* additional federal program funding); and (3) IHS alleges that the determination of what programs may be operated under the ISDA by tribes is an inherent Federal function (even though the very goal of ISDA is to promote Indian self-determination and allow tribes to make their own decisions about how best to serve their members).

12. IHS's asserted reasons for its rejection of the final offer are factually incorrect and without legal merit. The Tribe's proposal is consistent with all statutory requirements of the ISDA, and IHS has approved substantially similar opioid treatment program proposals put forward by other tribes. As such, IHS cannot meet its "burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer." § 5387(d).

13. By rejecting the Tribe's final offer to compact for the operation of an opioid treatment facility, IHS has breached its legal obligations to the Tribe and violated the ISDA. The Tribe seeks an injunction compelling IHS to award the Compact and Funding Agreement as proposed by the Tribe pursuant to the unique remedial provisions established in 25 U.S.C. §§ 5331(a) and 5391.

## THE PARTIES

14. Pechanga is a federally recognized Indian tribe headquartered in Temecula, California. Pechanga is an "Indian tribe" as that term is defined by the ISDA. § 5304(e).

15. Defendant Robert F. Kennedy, Jr., is the Secretary of the United States Department of Health and Human Services (HHS) and has overall responsibility for carrying out all of the functions, duties, and responsibilities of HHS, including the provision of health care services to American Indians and Alaska Natives and negotiating and entering into agreements with Indian tribes under the ISDA. He is sued in his official capacity.

16. Defendant Clayton Fulton is the Chief of Staff of IHS and is sued in his official capacity. Mr. Fulton exercises authority delegated by the Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law, and has been delegated all delegable authorities, duties, and functions of the IHS director for as long as that position continues to be vacant. IHS is the agency within HHS

responsible for providing, administering, and overseeing federal health services to American Indians and Alaska Natives, including the approval of compacts and funding agreements under Title I and Title V of the ISDA.

17. Defendant Beverly Miller is the Area Director for the IHS California Area Office and is sued in her official capacity. Director Miller exercises authority delegated by the Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law within the California Area.

18. Defendant Wesley Simmons is the Area Lead Negotiator (ALN) for the IHS California Area and is sued in his official capacity. ALN Simmons exercises authority delegated by the Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law.

19. As used in this Complaint (and unless context commands otherwise), the terms "Secretary," "Director," "HHS," and "IHS" are used interchangeably.

## FACTUAL AND STATUTORY BACKGROUND

### A. The Indian Health Care Improvement Act

20. Based on treaties and its unique relationship with Indian tribes, the federal government recognizes a responsibility "to provide all resources necessary" to ensure "the highest possible health status for Indians." § 1602(1). The Indian Health Care Improvement Act (IHCIA), enacted in 1976, codifies this trust responsibility and seeks to improve the quality of health care provided to IHS

beneficiaries. §§ 1601-1685. In passing the IHCIA, Congress found that a "major national goal of the United States is to provide the quantity and quality of health services [to Indians] which will permit the health status of Indians to be raised to the highest possible level and to encourage the maximum participation of Indians in the planning and management of those services. § 1601(3).

21. In the IHCIA, Congress further emphasized that its goals included "maxim[izing] Indian participation in the direction of health care services" and "render[ing] the persons administering such services and the services themselves more responsive to the needs and desires of Indian communities." § 1602(3).

**B. The Indian Self-Determination Act**

22. Similarly, the purpose of the ISDA is to assure "maximum Indian participation" in the provision of services to Indian communities. § 5302(a). The ISDA seeks to achieve this purpose through the "establishment of a meaningful Indian self-determination policy," which provides for the transition of federal programs serving Indian Tribes from IHS operation to tribal operation. § 5302(b).

23. Congress found in the ISDA that "the prolonged Federal domination of the Indian service programs has served to retard rather than enhance the progress of Indian people and their communities." § 5301(a)(1).

24. When enacting the self-governance provisions in Title V of the ISDA, Congress found that "the Federal bureaucracy, with its centralized rules and

regulations, has eroded tribal self-governance and dominates tribal affairs." § 5381 note (quoting Pub. L. No. 106-260, § 2(3), 114 Stat. 711 (2000)). The self-governance program "was designed to improve and perpetuate the government-to-government relationship between Indian tribes and the United States and to strengthen tribal control over Federal funding and program management." *Id.* (quoting Pub. L. No. 106-260, § 2(4)).

25. In enacting Title V, Congress called for "full cooperation" from the Secretary and his constituent agencies "in the implementation of tribal self-governance," including "to permit an orderly transition from Federal domination of programs and services to provide Indian tribes with meaningful authority, control, funding, and discretion to plan, conduct, redesign, and administer programs, services, functions, and activities (or portions thereof) that meet the needs of the individual tribal communities." *Id.* (quoting Pub. L. No. 106-260, § 3(2)(F), 114 Stat. 712 (2000)).

26. Under Title V of the ISDA, "[t]he Secretary shall negotiate and enter into a written compact [and a written funding agreement] with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States." § 5384(a); *see* § 5385.

27. The ISDA requires the Secretary to "at all times negotiate in good faith to maximize implementation of the self-governance policy." § 5387(e).

28. Title V further provides: "Each funding agreement [under Title V] shall, as determined by the Indian tribe, authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding, including tribal shares of discretionary Indian Health Service competitive grants . . . , for all programs, services, functions, and activities [PSFAs] that are carried out for the benefit of Indians because of their status as Indians without regard to the agency or office of the Indian Health Service within which the [PSFA] is performed." § 5385(b)(1).

29. Title V includes broad authority for PSFAs to be included in a tribal funding agreement. *See* § 5385(b)(2). According to Title V, "[i]t shall not be a requirement that an Indian tribe or Indians be identified in the authorizing statute for a program or element of a program to be eligible for inclusion in a compact or funding agreement under this subchapter." § 5385(c).

30. Title V also requires that IHS interpret all federal laws and regulations to facilitate "the inclusion of [PSFAs] and funds associated therewith, in [self-governance compacts and funding agreements]; the implementation of compacts and funding agreements entered into under [Title V]; and the achievement of tribal health goals and objectives." § 5392(a).

31. Under Title V, "[a]n Indian tribe may redesign or consolidate [PSFAs] included in a funding agreement . . . and reallocate or redirect funds for such [PSFAs] in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served" so long as the redesign "does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law." § 5386(e).

32. Under Title V, "[t]he Secretary shall provide funds under a funding agreement . . . in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under [Title I]." § 5388(c). Title I, in turn, mandates that the direct program funding "shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs[.]" § 5325(a)(1).

33. When an Indian tribe withdraws from a participating intertribal consortium or tribal organization, or (as relevant here) withdraws only with respect to certain PSFAs operated by the intertribal entity:

> (A) the withdrawing Indian tribe . . . shall be entitled to its tribal share of funds supporting those programs, services, functions, or activities (or portions thereof) that the Indian tribe will be carrying out under its own . . . compact and funding agreement (calculated on the same basis as the funds were initially allocated in the funding agreement of the inter-tribal consortium or tribal organization); and

> (B) the funds referred to in subparagraph (A) shall be transferred from the funding agreement of the inter-tribal consortium or tribal organization . . . .

§ 5386(g)(2).

34. When a tribe submits a final offer for a compact, the Secretary has 45 days to review that offer. § 5387(b). If the Secretary rejects the offer, the Secretary must provide the tribe with:

> a timely written notification . . . that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority that—
>
> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under [Title V];
>
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>
> (iv) the Indian tribe is not eligible to participate in self-governance . . . .

§ 5387(c)(1)(A).

35. If the Secretary rejects a final offer, the Secretary must also provide "the Indian tribe with the option of entering into the severable portions of a final proposed compact or funding agreement, or provision thereof, (including a lesser

funding amount, if any), that the Secretary did not reject, subject to any additional alterations necessary to conform the compact or funding agreement to the severed provisions." § 5387(c)(1)(D).

36. In a civil action challenging the Secretary's rejection of a final offer under one of the four reasons listed in paragraph 34, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)." § 5387(d).

37. The ISDA provides that both the Act itself and all compacts and funding agreements entered into under the Act "shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." § 5392(f); *see also* § 5366(i).

**C. Impact of the Opioid Epidemic on Indian Country**

38. The tragically urgent need for opioid treatment across America is well documented. Native Americans are often among the hardest hit by health care crises, and the opioid epidemic is no exception. In IHS's own words, "The impact of the opioid crisis on American Indian and Alaska Native (AI/AN) populations is immense." Indian Health Serv., *Community Opioid Intervention Pilot Projects*, 85 Fed. Reg. 65,845 (Oct. 16, 2020).

39. Statistics recited by IHS show, for example: (a) AI/ANs had the highest overdose death rates from prescription opioids (7.2 deaths/100,000 population)

during 2016-2017; (b) AI/AN overdose death rates from heroin, fentanyl, and all opioids were higher than the rates of the general population in 2017; and (c) between 2015 and 2017, the rate of overdose deaths for AI/ANs rose by 13%. *See id.* According to the U.S. Centers for Disease Control and Prevention, another agency within HHS, overdose deaths have increased even further in recent years. *See* U.S. Ctrs. for Disease Control & Prevention, *Drug Overdose Prevention and Tribal Communities*, https://www.cdc.gov/overdose-prevention/health-equity/tribal-communities.html (last visited Dec. 16, 2025).

40. Pechanga has experienced multiple tribal member deaths due to opioid addiction and overdose. These tragedies are devastating not only to the directly impacted families but also to the entire tribal community. One tribal member suffering from addiction died during the negotiation of the compact that is the subject of this action.

41. On information and belief, HHS and IHS recognize the dire need for improved opioid treatment services for tribal members. IHS does not, however, offer robust opioid addiction treatment services on or near the Pechanga lands.

42. Tribal members and other Indians in the area currently have only limited opioid addiction and treatment services available.

43. After experiencing multiple tragedies due to opioid addiction, Pechanga decided to establish its own opioid treatment program to provide

desperately needed services for its members and other Indians in the surrounding community.

**D. Pechanga's Contract History**

44. Pechanga is a member of the Riverside San-Bernardino County Indian Health, Inc. (Riverside), a consortium of federally recognized tribes that provides health care services to beneficiaries of IHS programs and other eligible individuals. Riverside qualifies as a "tribal organization" under § 5304(l) and as an "Indian tribe" under § 5381(b).

45. Riverside operates federal IHS programs pursuant to a compact with IHS, as authorized under Title V of the ISDA. Riverside's programs do not, however, include the comprehensive opioid addiction treatment and wrap-around services Pechanga seeks to provide.

46. Having witnessed the ongoing harms of the opioid epidemic, the Tribe proposed to open an opioid treatment clinic to expand the services available to its members. To do so, the Tribe proposed to transfer 2.5% of its share of federal funds from Riverside to the Tribe (approximately 60% of which, or $12,644 annually, would be for the proposed opioid treatment program) and chose to invest more than $5.5 million of its own funds into the program.

47. Riverside has expressly recognized the need for the enhanced services proposed by Pechanga, and supports Pechanga's efforts to create this important program, including the partial withdrawal of IHS funding from Riverside.

48. Pechanga's planned operation included engaging OneTogether Solutions (OneTogether) to manage the clinic under the Tribe's control, pursuant to a master services agreement between the Tribe and OneTogether.

49. Pechanga was aware that OneTogether had worked with other tribal opioid treatment programs that were approved by IHS under the ISDA. Pechanga and other tribes also secured ownership interests in OneTogether. OneTogether is a majority Indian-owned entity.

## COMPACT NEGOTIATIONS

### A. Negotiations with the Area Lead Negotiator

50. At a meeting of Pechanga's general membership on March 12, 2023, the membership overwhelmingly approved a resolution authorizing negotiations with IHS for a new Title V compact to provide opioid treatment services.

51. The resolution states:

> [The proposal] will help to enhance care for which the Band, its members and other Indians are significant beneficiaries in furtherance of [the ISDA], that the Band's proposal will include the performance [of] services permitted under [the ISDA], and will facilitate and supplement initiatives, programs, and policies authorized by [the ISDA] and other federal laws benefiting Indians and Indian tribes.

52. By letter dated August 11, 2023, the Tribe submitted a written request to IHS to initiate the application process for a new compact and funding agreement under Title V of the ISDA.

53. The Tribe's proposal included two distinct programs. First, the Tribe sought to establish a new opioid treatment program. Second, the Tribe sought to assume certain administrative functions to coordinate the processing of Purchased/Referred Care. Purchased/Referred Care is a federal program that provides referrals and funding for tribal members to receive specialty care from providers outside of the IHS and tribal health system, when that care is not available within the system. *See* 42 C.F.R. Part 136, Subpart C. The Purchased/Referred Care portion of the proposal is not at issue in this litigation.

54. The initial negotiation meeting with IHS was conducted on September 1, 2023. At this meeting, ALN Simmons confirmed that he was familiar with and had approved other similar tribal opioid treatment programs under the ISDA. ALN Simmons expressed his support for the Tribe's project.

55. Also at the initial negotiation meeting, Pechanga explained that it would not seek new program funding from IHS, but rather would seek to withdraw a small portion of its existing funding allocation from Riverside. The Tribe explained it wanted to minimize the amount of funding withdrawn from Riverside to avoid

negative impacts on that program, and confirmed it would work with Riverside to coordinate the funding withdrawal.

56. On September 13, 2023, the Tribe and IHS met again to discuss the Tribe's proposed compact. ALN Simmons remained supportive of the project.

57. On this same day, the Tribe submitted to Beverly Miller, Area Director for the IHS California Area Office, a letter seeking pre-award costs under the ISDA. Pre-award costs are a category of contract support costs. § 5325(a)(5).

58. By letter dated October 5, 2023, IHS acknowledged the Tribe's request for pre-award costs.

59. In the ensuing months, between January and May 2024, Pechanga and IHS held several additional meetings on the Tribe's proposed compact.

60. During these meetings, ALN Simmons confirmed that he had approved a 5% withdrawal amount for another tribe establishing an opioid treatment program, and suggested that Pechanga should consider withdrawing that amount from Riverside.

61. During these meetings, Pechanga explained that it desired to withdraw a smaller amount to minimize the impact on Riverside.

62. During these meetings, Pechanga confirmed that the Tribe planned to provide supplemental funding and collect third-party revenues to fund the remainder of the costs associated with operating the proposed opioid treatment program.

63. During these meetings, Pechanga confirmed its intent that the Tribe's program would be open to all Pechanga members and other Indians, and that the Tribe also planned to serve non-Indian patients.

64. ALN Simmons did not raise any objection during these discussions to the Tribe's plan to serve both Indian and non-Indian patients. Instead, ALN Simmons informed the Tribe that it would need to provide a "Section 813" resolution confirming the Tribe's intent to serve non-Indian patients. Section 813 of the Indian Health Care Improvement Act authorizes the governing body of an Indian tribe to elect to provide health services to non-Indian patients so long as the governing body considers whether doing so will "result in a denial or diminution of health services to eligible Indians." § 1680c(c)(2). By law, once a Section 813 resolution has been passed, any services provided to non-beneficiaries pursuant to the resolution are "deemed to be provided under" the ISDA compact. *Id.*

65. During these meetings, ALN Simmons also offered to provide sample language and review the Tribe's proposed Section 813 resolution in advance.

66. Throughout these meetings, Pechanga and IHS discussed the status of draft compact and funding agreement documents, the proposed timing for the project, the Tribe's eligibility to participate in Title V self-governance, and the funding amount to be withdrawn from Riverside to support the project.

67. At no point during these meetings did IHS raise any concerns regarding the Tribe seeking too much money, or serving non-beneficiaries so long as a Section 813 resolution was in place.

68. Similarly, IHS asked no questions and requested no information about whether the Tribe would contract with a service provider to assist with running the proposed program.

69. On March 7, 2024, Pechanga transmitted proposed compact and funding agreement documents to IHS reflecting discussions during prior meetings.

70. On March 12, 2024, IHS confirmed in writing that it had determined that the Tribe "has satisfied and met all statutory eligibility criteria required to participate in the IHS Tribal Self-Governance Program (TSGP) as authorized by Title V of the" ISDA.

71. On April 5 and April 11, 2024, IHS provided redlines and comments on the Tribe's proposed compact and funding agreement documents.

72. On April 11, 2024, the Tribe emailed IHS its draft Section 813 resolution authorizing services to non-Indian patients, seeking advance review from IHS.

73. On April 30, 2024, ALN Simmons confirmed via email that "We have no comments or concerns with the draft 813 resolution after taking a review of your draft."

74. On May 10, 2024, the Tribe presented to ALN Simmons the final Section 813 resolution, which was substantively identical to the draft ALN Simmons had approved. The resolution stated that:

- "[t]hrough the Clinic the Band intends to serve both eligible Indians and ineligible persons pursuant to Section 813 of the Indian Health Care Improvement Act";
- the Tribe had taken into account all statutory requirements of Section 813 including the Tribe's determination that "third party reimbursements for services to non-Indian patients will allow the Band to provide such services in a manner that will not result in a denial or diminution of health services to eligible Indians"; and
- the "Band has further determined that services to non-Indian patients . . . . will enable the Band to improve and expand health services to Indian patients."

75. On May 23, 2024, ALN Simmons circulated updated drafts of the compact and funding agreement documents. He confirmed that "the next big step to proceed forward is receiving the withdrawal resolution and amounts" that Pechanga would seek to withdraw from Riverside to fund the proposed project.

76. On June 28, 2024, ALN Simmons agreed to reduce the withdrawal from Riverside from 5% (as he had previously suggested) to 2.5%. The Tribe agreed to present a draft withdrawal resolution consistent with that amount.

77. On July 17, 2024, IHS and the Tribe met again. The meeting focused in part on the steps necessary to achieve a February 1, 2025 opening date. IHS expressed no indication that an agreement could not be finalized by that date.

78. On August 14, 2024, Pechanga sent ALN Simmons a draft resolution for his advance review authorizing a withdrawal of 2.5% of Pechanga's current funding allocation from Riverside to fund the Tribe's proposed compact.

79. At a meeting on August 15, 2024, IHS expressed no concerns with the funding resolution. The parties agreed that the goal would be to get all documents completed by September. ALN Simmons confirmed that he wanted to have his submission package ready for IHS headquarters by November 2024 to meet the Tribe's proposed effective date of February 1, 2025.

80. On August 15, 2024, the Tribe approved the final withdrawal resolution and sent it to IHS.

81. On September 12, 2024, IHS and Pechanga held another negotiation meeting. At this meeting, the parties agreed on final redline edits to the proposed compact and funding agreement, at which point all material terms were finalized.

82. On September 13, 2024 ALN Simmons sent updated documents via email reflecting the parties' agreements specified in paragraph 81. The remaining questions from the ALN at that time concerned the name of the clinic, banking information for the receipt of funding, and whether the Tribe had any further questions.

83. By early October 2024, the Tribe was working with IHS to finalize minor details for implementation of the compact. At this point the Tribe and IHS had agreed on:

a. all material terms of the proposed compact and funding agreement,

b. the funding percentage to be withdrawn from Riverside; and

c. the Tribe's right to provide services to non-beneficiaries (as set out in the Section 813 resolution that IHS had approved).

84. Based on assurances from ALN Simmons throughout the negotiation process, the Tribe expected the project was on target for a February 2025 opening and proceeded to invest more than $5.5 million of its own funds in the project. These funds were used in part to lease and remodel a facility for the clinic and to fund other costs in preparation for opening the clinic.

**B. IHS's Request for Additional Information**

85. By email dated October 16, 2024, ALN Simmons asked Pechanga legal counsel to provide, "[i]f possible, . . . the sub-contract or agreement between OneTogether Solutions and [the Tribe]."

86. This was the first mention by IHS of any desire for details regarding OneTogether or any other professional services that Pechanga planned to obtain in relation to its opioid treatment program. At no time during any negotiation meetings over the prior year did IHS request any information regarding any service providers the Tribe would contract with.

87. ALN Simmons provided no indication at that time that the request for the Tribe's master services agreement with OneTogether was either material or was a condition to moving the compact approval forward.

88. OneTogether operates several other tribal opioid treatment programs, two of which are in California and are operated under contracts or compacts that were approved by IHS through ALN Simmons. On information and belief, there are no material differences between the level of services OneTogether provides to these other tribes and the level OneTogether would provide to Pechanga under the master services agreement.

89. Thus, the Tribe had no reason to believe that services provided through OneTogether would present a concern.

90. On November 8, 2024, Pechanga counsel emailed ALN Simmons the banking information IHS had requested and sought to confirm that things were still on track for a February effective date.

91. On November 13, 2024, ALN Simmons wrote to Pechanga legal counsel: “We will need written agreement between Pechanga Band of Indians and OneTogether Solutions before we proceed any further.”

92. That day, Pechanga legal counsel asked ALN Simmons for a short call to discuss the status of IHS’s review of the compact.

93. After initially expressing availability to meet, ALN Simmons ultimately declined to meet or discuss what IHS was looking for in the master services agreement until after that agreement had been provided.

94. On November 19, 2024, Pechanga provided a copy of the OneTogether master services agreement to ALN Simmons. The agreement included redactions of certain financial arrangements and other information that the Tribe sought to protect from possible FOIA disclosure. Pechanga legal counsel offered to discuss the redacted portions with ALN Simmons as necessary. Pechanga counsel again requested a meeting with IHS on this matter, as IHS had not responded to the Tribe’s questions about what IHS was looking for in the master services agreement or how it related to the compact approval.

95. On November 21, 2024, Pechanga legal counsel emailed ALN Simmons again to regroup on the matter. ALN Simmons responded via email by requesting the unredacted master services agreement, and declined to meet with the Tribe before that document was provided.

96. On November 22, 2024, Pechanga legal counsel offered via email to share the redacted portions of the OneTogether master services agreement on screen over a videoconference to assure IHS that the Tribe was not trying to keep any information from IHS.

97. On November 26, 2024, ALN Simmons responded via email mischaracterizing the Tribe's offer to allow IHS to preview all provisions of the agreement on screen as an attempt to "withhold information from the IHS."

98. After it became clear that IHS was unwilling to work with the Tribe on a way to provide IHS access to contract language while still preserving confidentiality, the Tribe provided an unredacted copy of the master services agreement to IHS on December 5, 2024. By this point the Tribe had begun to express concerns to IHS that IHS's delay would result in a delayed opening for the Tribe's opioid treatment program.

99. On December 27, 2024, IHS and Pechanga held a negotiation meeting on the Tribe's proposed compact. This was the first meeting IHS had agreed to with the Tribe since September 12, 2024.

100. No compact or funding agreement terms were discussed at this meeting. Instead, the focus was primarily on the master services agreement. The meeting was primarily led by IHS attorney Paula Lee.

101. Attorney Lee stated IHS's view that the master services agreement did not meet the requirements of the ISDA because the program would not be conducted and administered by the Tribe "for Indians because of their status as Indians." Attorney Lee also expressed concerns that the master services agreement might violate Indian preference requirements, and inquired whether OneTogether was a majority Indian-owned entity.

102. On January 2, 2025, ALN Simmons sent an email memorializing his understanding of the December 27, 2024 meeting, and alleging for the first time that: "Given that the Tribe has never operated a health care program under ISDEAA, IHS has grave concerns about the Tribe's ability to conduct and administer an [opioid treatment program]."

103. The Tribe, however, has a long history of participating as a member of the board of Riverside, a Title V program providing health services. The Tribe's Title V eligibility for this project was also previously confirmed by IHS.

104. On January 7, 2025, Pechanga formally requested "technical assistance to cure any concerns that IHS may have with regard to this project" and noted "that Pechanga's goal is full compliance with [the ISDA]."

105. In its email requesting technical assistance, Pechanga stated that the Tribe was willing to amend the master services agreement to address any IHS concerns. Pechanga also confirmed that OneTogether is a majority Indian-owned entity, and that staffing and hiring for the clinic had not yet taken place. Thus, the Tribe expressed its willingness to present Indian-preference policies for IHS's consideration. Pechanga noted that IHS had approved other tribal opioid programs with management services provided by OneTogether. Pechanga asked IHS the basis for its "grave concerns" regarding Pechanga's ability to administer a Title V compact or operate an opioid treatment program.

106. On January 8, 2025, IHS and Pechanga met again. Pechanga reiterated its request for technical assistance and its willingness to make changes to the master services agreement. IHS declined to provide substantive suggestions or assistance. Instead, IHS stated that the Tribe could propose changes and IHS would respond.

107. IHS and Pechanga met again on January 22, 2025. The parties discussed provisions of the OneTogether master services agreement in order for the Tribe to get a better understanding of IHS's concerns and what changes could be proposed to resolve them.

108. At this meeting, IHS's concerns focused primarily on whether the proposed services would be provided by Indians and for Indians. On the first point, IHS expressed concern that the Tribe would not have sufficient control over

OneTogether's operations and repeatedly questioned whether OneTogether was majority Indian-owned. On the second point, IHS was concerned that a majority of individuals served would potentially be non-beneficiaries, i.e., neither members of the Tribe nor other eligible Indian patients.

109. On February 4, 2025, Pechanga sent IHS the Tribe's proposed redlines to the master services agreement. These redlines were intended to address all of the concerns that IHS had raised.

110. Pechanga and IHS met again on February 7, 2025, February 14, 2025, and February 25, 2025. At each meeting Pechanga confirmed that it was willing to make further changes if IHS could simply let the Tribe know what language they were seeking.

111. On March 7, 2025, ALN Simmons informed Pechanga via email that the proposed redlines to the master services agreement were not sufficient to resolve IHS's concerns. On that same day, Pechanga offered again to propose additional changes to the master services agreement in order to address any remaining IHS concerns.

112. Pechanga provided those additional redline changes to IHS on March 18, 2025, along with a letter explaining the changes and various other supporting documents. The Tribe reiterated its willingness to make additional changes to the master services agreement and again asked for "suggestions and technical assistance

on specific changes that would fully address any remaining concerns [IHS] may have." IHS never provided the requested technical assistance.

113. On March 18, 2025, IHS and the Tribe held another meeting. IHS stated that it needed more time to review the Tribe's proposed changes.

114. On March 28, 2025, IHS and Pechanga met again. IHS offered no additional suggestions to the master services agreement and instead claimed for the first time that the agency was under the impression that the Tribe was not willing to make additional changes.

115. Pechanga promptly clarified that the Tribe had always been willing to make additional changes and had made this clear in each meeting as well as in writing. At no time did Pechanga ever state that it was unwilling to make changes to the master services agreement or otherwise work with IHS to overcome the agency's objections.

116. IHS thereafter agreed to look at further possible changes to the master services agreement and asked for additional data from the Tribe regarding the projected need for opioid care in the Native community.

117. On April 4, 2025, Pechanga sent a detailed letter outlining additional data on Native need for opioid treatment services. The letter again expressly stated the Tribe's willingness to continue working with IHS to make changes to the master services agreement needed to move the project forward.

118. The parties held another negotiation meeting that same day. At the meeting, IHS confirmed it was still reviewing the proposed master services agreement redlines and the data the Tribe had provided.

119. At the next meeting, on April 25, 2025, IHS did not propose any further changes to the master services agreement. Instead, IHS officials stated they had no further requests for information and expressed their view that the parties were at an impasse and that IHS intended to reject the Tribe's proposed compact.

120. To summarize, the preceding six months of discussion with IHS over the terms of the master services agreement were in vain because IHS had now made clear that no possible changes to the agreement would permit IHS to agree to the proposed compact.

**C. Final Offer**

121. On May 20, 2025, the Tribe sent IHS a final offer under § 5387(b), seeking approval of its proposed Title V compact and the associated funding agreement. *See* Attachment A.

122. Noting that IHS had 45 days to respond to the final offer, Pechanga asked in its offer that IHS "work with the Tribe through providing technical assistance during the 45-day period to cure any anticipated grounds for rejection."

123. The final offer also requested that IHS sever and promptly approve the portions of the proposal that dealt with the Tribe's proposed Purchased/Referred Care program, *see supra* ¶ 53, which IHS had never objected to.

124. By June 17, 2025, IHS had not responded to the final offer letter or the request for technical assistance. Pechanga sent a follow up email again seeking technical assistance and expressing that the Tribe's "goal is to work in good faith with IHS to address any possible concerns at the earliest opportunity, and to make ourselves available (or provide additional information you may need) to resolve any potential concerns if possible before they otherwise rise to the level of a rejection."

125. On June 20, 2025, IHS agreed to meet with the Tribe, but only if the Tribe would extend the deadline to respond to the final offer by another 30 days.

126. On June 24, 2025, the Tribe confirmed its willingness to extend the deadline provided that IHS felt that there were specific changes or actions that Pechanga could address through technical assistance. The Tribe also offered to provide additional support or explanations as needed.

127. On July 1, 2025, the Tribe and IHS met to discuss technical assistance.

128. During the July 1 meeting, IHS offered no technical assistance as to changes the Tribe could make to secure approval of the compact.

129. IHS instead suggested that Pechanga should rely on Riverside for the provision of opioid treatment services. IHS did not explain why IHS believed it was

permissible under the ISDA for Riverside to provide opioid treatment services but not for Pechanga to do so.

130. IHS reiterated its contention that the program proposed by Pechanga would violate the ISDA because it would not be (in its view) administered for the benefit of Indians.

131. During this meeting, the Tribe pointed to its written assurances and its proposed changes to the master services agreement with OneTogether to confirm the Tribe's intent that the program would be administered in compliance with all provisions of the ISDA. The Tribe again offered to consider any further changes that IHS believed necessary.

132. The Tribe reiterated to IHS that 100% of Pechanga tribal members would be eligible for services from the program. The Tribe also pointed out the urgency of improving opioid services, noting that another Pechanga member suffering from addition had died while these negotiations were underway.

133. The Tribe explained that the program would benefit all other Indians in the area, including the Indian patients of Riverside. The Tribe reiterated the information it had previously provided to IHS regarding the need for opioid treatment services for Indians. The Tribe also pointed to a June 27, 2025 letter from Riverside expressing support for the Pechanga program, and expressly confirming the need for such a program to serve Indians in the region.

134. IHS nonetheless confirmed that it intended to reject the final offer.

135. By letter dated July 2, 2025, Pechanga reached out once again to state its continued willingness to work with IHS to address its concerns, and also provided additional information regarding the higher level of services to be provided under the Pechanga proposal as compared to services currently available through Riverside.

**D. Rejection of the Final Offer**

136. By letter dated July 3, 2025, IHS partially rejected the Tribe's final offer. *See* Attachment B.

137. IHS agreed to sever and approve that portion of the proposed compact and funding agreement that addressed the Tribe's assumption of certain Purchased/ Referred Care administrative functions. *See supra* ¶ 53. That portion of the proposal is not at issue in this case.

138. However, IHS rejected the Tribe's proposal to operate an opioid treatment program.

139. The rejection letter gave three reasons for IHS's rejection of the final offer. First, IHS's letter stated that the Pechanga program would not significantly benefit Native patients, and characterized the proposal as "illegal." The letter describes the program's benefit to Indians as "miniscule," and states that it is "unclear whether any of [Pechanga's] members will choose to receive care at the

proposed [opioid treatment program].” The rejection letter instead encouraged Pechanga to work with Riverside to improve opioid treatment services.

140. On information and belief, IHS did not speak to Riverside, any Indian patients of Riverside, or any Pechanga members before concluding that enhanced services under the Pechanga proposal would not be utilized by IHS beneficiaries.

141. Second, the rejection letter asserted that the proposal seeks funds that exceed the applicable funding level to which the Tribe is entitled.

142. Third, the rejection letter contended that the Tribe is seeking to assume an “inherent federal function that cannot legally be delegated.”

### E. Post-Rejection Communication

143. By letter dated August 1, 2025, the Tribe requested post-rejection technical assistance to overcome IHS’s grounds for rejection.

144. The August 1 letter sought to clarify, correct, and resolve key factual assumptions contained in the rejection letter, to get clarity on the specific grounds for rejection that IHS relied on, and to understand what the Tribe could do to overcome the objections.

145. On August 13, 2025, IHS conducted a technical assistance call with the Tribe. IHS did not provide any suggestions as to how the grounds for rejection could be overcome. Instead, IHS reiterated its pre-rejection suggestion that Tribal members should receive opioid treatment services through Riverside.

146. At no time during the negotiations, after the final offer, or after the rejection has IHS offered technical assistance to address the statutory grounds for rejection under § 5387.

147. After IHS rejected the Tribe's final offer, the Tribe also began efforts to schedule a tribal delegation meeting (TDM) with then-Acting Director of IHS Ben Smith. On August 4, 2025, the Tribe confirmed with ALN Simmons that the Tribe's request for a TDM was distinct from the technical assistance it sought from IHS.

148. On August 19, 2025, Acting Director Smith declined to meet with Pechanga representatives unless elected officials were present.

149. A TDM was ultimately held on September 30, 2025, with the Pechanga elected leadership present.

150. At the TDM, Acting Director Smith informed the Tribe that he would stand by IHS's rejection of the proposed compact.

151. Based on his comments at the TDM, Acting Director Smith did not appear familiar with the facts of the prior negotiations. For example, Acting Director Smith made statements indicating a belief that it was the *Tribe* that had declared an impasse, and that the Tribe was unwilling to work with IHS to make further changes to move the project forward, which was inaccurate. Acting Director Smith also made statements indicating that he believed technical assistance was actively being provided to the Tribe, which was inaccurate.

152. By letter dated October 31, 2025, the Tribe made an additional attempt to secure help from Acting Director Smith. Neither Acting Director Smith nor anyone at IHS ever responded to this request.

**IHS'S UNLAWFUL GROUNDS FOR REJECTION**

153. IHS failed to apply the correct criteria and failed to meet its statutory burden for rejecting the Tribe's final offer.

154. As explained above, *supra* ¶ 34, the ISDA authorizes IHS to deny a final offer on only four bases, and it requires IHS to "clearly" demonstrate with "specific" findings that its grounds for rejecting a final offer satisfy the Act's strict standards. § 5387(c)(1)(A). IHS bears "the burden of demonstrating by clear and convincing evidence the grounds for rejecting the offer." § 5387(d). If IHS does reject a final offer, it is obliged to provide "technical assistance to overcome" any such objections. 25 U.S.C. § 5387(c)(1)(B).

155. IHS's rejection letter failed to clearly demonstrate that any of the allowable bases for rejection are satisfied here.

156. First, IHS may deny a final offer because "the amount of [Federal] funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled." § 5387(c)(1)(A)(i).

157. IHS has failed to clearly demonstrate that this basis for rejection applies here, for multiple reasons including the following:

a. The ALN accepted the Tribe's proposal on the specific percentage of funds to be transferred from IHS's current compact with Riverside in order to fund the Pechanga contract (approximately $12,644 annually for opioid treatment services).

b. The Tribe has not requested any new funds from IHS. IHS has not provided controlling legal authority or clearly demonstrated how a compact that will cost IHS zero dollars, and instead involved the transfer of existing funds from one compactor to another, could possibly exceed the applicable funding level for a state-of-the-art opioid treatment center.

c. IHS has not provided technical assistance to overcome this ground.

158. Second, IHS may deny a final offer because "the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe." § 5387(c)(1)(A)(ii).

159. IHS has failed to clearly demonstrate that this basis for rejection applies here, for multiple reasons including the following:

a. Pechanga has not proposed operating a program that would conduct an inherent federal function.

b. IHS has previously awarded ISDA contracts and compacts that include opioid treatment services.

c. IHS has specifically awarded ISDA contracts or compacts within the California Area that include opioid treatment clinics which utilize private sector specialist providers to assist in operating the clinic.

d. IHS has specifically approved contracts or compacts in the California Area that include opioid treatment clinics which utilize management services provided by OneTogether.

e. IHS has not provided controlling legal authority or clearly demonstrated how the opioid treatment services would constitute an inherent federal function.

f. IHS has not provided technical assistance to overcome this ground.

160. IHS does not assert that the final two grounds for rejection set forth in the ISDA are applicable here. The rejection letter does not assert that the Tribe's proposed program would result in "significant danger or risk to the public health," § 5387(c)(1)(A)(iii), or that the Tribe " is not eligible to participate in self-governance," § 5387(c)(1)(A)(iv).

161. Any rejection of the proposal outside of the four statutory criteria, including IHS's argument regarding non-beneficiary care, is improper, violates the ISDA, and is not a lawful basis for rejecting a final offer.

162. Nonetheless, IHS's rejection letter gave an additional ground for rejecting the Tribe's final offer: IHS asserted that the Tribe's proposed opioid treatment program "would overwhelmingly benefit non-Indians, rather than provide health services for the benefit of Indians because of their status as Indians as mandated by the [ISDA]."

163. The rejection letter does not assert that this reason for objecting to the Tribe's final offer falls under any of the four listed grounds for rejecting a final offer under § 5387(c)(1)(A).

164. This third ground asserted in the rejection letter does not provide a legal basis for rejecting the Tribe's final offer, for multiple reasons including the following:

a. A tribe's provision of services to non-beneficiaries is not one of the four limited grounds on which IHS may reject a final offer under § 5387(c)(1)(A).

b. Similarly, a tribe's provision of services to non-beneficiaries is not a basis upon which Congress has authorized IHS to reject a proposed contract. The Tribe's proposed compact does not

violate the ISDA's provisions regarding service to non-beneficiaries. The ISDA requires only that Indians or Indian Tribes must be the "primary or significant beneficiaries" of the programs or services provided by a Tribe, § 5385(b)(2), and the ISDA provides express authorization to serve non-beneficiaries so long as the specified procedures are followed, § 1680c(c)(2).

c. Pechanga members and other eligible IHS beneficiaries, as well as Pechanga and Riverside, will be significant beneficiaries of the Tribe's proposed opioid treatment program. The program will provide services to the Tribe's members and other IHS beneficiaries who suffer from opioid use disorder, services which are not currently available to them.

d. IHS's rejection letter does not clearly demonstrate the basis for IHS's conclusion that there is no significant benefit to Indians or Indian tribes.

e. IHS has not provided technical assistance to overcome this ground.

165. IHS also failed to apply the correct rules of construction when it interpreted the ISDA to prevent Pechanga from compacting to provide opioid treatment services. In addition to the general rule requiring that every provision of

Title V "shall be liberally construed for the benefit of the Indian tribe participating in self-governance," § 5392(f), Title V also specifically requires that IHS interpret all federal laws and regulations to facilitate "the inclusion of [PSFAs] and funds associated therewith, in [self-governance compacts and funding agreements]; the implementation of compacts and funding agreements entered into under [Title V]; and the achievement of tribal health goals and objectives." § 5392(a). IHS did not apply these mandatory rules of construction when rejecting the Tribe's final offer.

## ADDITIONAL ALLEGATIONS FOR DECLARATORY & INJUNCTIVE RELIEF

166. The foregoing allegations present an actual, justiciable controversy that is ripe for review.

167. A declaration will serve a useful purpose in clarifying and settling the legal relations at issue. It will determine legal rights and payment obligations between the Tribe and IHS, as well as afford relief from the uncertainty and controversy faced by the parties.

168. A declaration in the Tribe's favor is also in furtherance of public policy, as stated in 25 U.S.C. §§ 1601, 1602, 5301, and 5302.

169. Independent of the Tribe's rights at equity, under 25 U.S.C. § 5331 (and § 5391, applying § 5331 to Title V compacts), the Tribe is entitled by law to immediate injunctive relief as follows:

> In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (*including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title* or to compel the Secretary to award and fund an approved self-determination contract).

§ 5331(a) (emphasis added).

**FIRST CAUSE OF ACTION**

**(Violation of 25 U.S.C. § 5387; Failure to Approve Compact)**

170. The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

171. The Tribe properly followed the procedure for making its final offer to IHS pursuant to 25 U.S.C. § 5387 and the applicable federal regulations thereunder.

172. IHS rejected the Tribe's final offer for a compact and funding agreement but has not clearly demonstrated that any of the permissible statutory bases for rejection apply, in violation of § 5387(c)(1)(A).

173. Despite the Tribe's repeated requests for technical assistance both pre- and post-rejection, IHS has not provided any technical assistance to the Tribe to overcome IHS's objections, in violation of § 5387(c)(1)(B).

174. IHS failed to negotiate in good faith, in violation of § 5387(e) and in violation of its general and specific duties to work with the Tribe to coordinate and improve health care delivery to members, and to consult with the Tribe on such matters in good faith.

175. IHS's rejection of the proposed compact is null and void, and the Tribe is entitled to approval of the proposed compact and funding agreement submitted to IHS in its final offer.

176. The Tribe is also entitled to monetary damages and declaratory and injunctive relief as set forth below.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff, the Pechanga Band of Indians, granting the following relief:

1. A declaration that IHS's rejection of the Tribe's final offer violated ISDA § 5387;

2. An immediate injunction pursuant to §§ 5331 and 5391 directing IHS to approve the Tribe's proposed compact and funding agreement as submitted to IHS in the Tribe's final offer, including the transfer of recurring program funding from Riverside to Pechanga, and the payment of full contract support costs pursuant to § 5385(a)(2)-(3);

3. Monetary damages equal to the Tribe's actual damages caused by IHS's unlawful rejection of the Tribe's final offer;

4. Reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statutory provisions; and

5. Any and such other relief the Court deems proper.

Respectfully submitted this 31st day of December 2025.

SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP

By: *_/s/ Colin C. Hampson_*
Colin C. Hampson
California Bar No. 174184
champson@sonoskysd.com
145 Willow Road, Suite 200
Bonita, CA 91902
Telephone: (619) 267-1306

SONOSKY, CHAMBERS, SACHSE,
MILLER & MONKMAN, LLP
Lloyd B. Miller
lloyd@sonosky.net
*Pro hac vice forthcoming*
Whitney A. Leonard
whitney@sonosky.net
*Pro hac vice forthcoming*
Chloe E. Cotton
chloe@sonosky.net
*Pro hac vice forthcoming*
510 L Street, Suite 310
Anchorage, Alaska 99501
Telephone: (907) 258-6377

YODER & LANGFORD, P.C.
Robert Yoder
robert@yoderlangford.com
*Pro hac vice forthcoming*
8175 East Evans Road #13598
Scottsdale, Arizona 82567
Telephone: (602) 808-9578

PECHANGA BAND OF INDIANS
OFFICE OF GENERAL COUNCIL
Steve Bodmer, General Counsel
sbodmer@pechanga-nsn.gov
California Bar No. 257123
12705 Pechanga Road
Temecula, California 92593
Telephone: (951) 770-6171

*Attorneys for Plaintiff Pechanga Band of Indians*

# VERIFICATION OF COMPLAINT

STATE OF CALIFORNIA )
)
COUNTY OF RIVERSIDE )

I, Steve Bodmer, being duly sworn and upon oath, state that I am the General Counsel for the Pechanga Band of Indians, that I have read the foregoing Complaint, and that the factual information contained therein is true and accurate to the best of my knowledge and belief.

Steve Bodmer
General Counsel

SUBSCRIBED AND SWORN to before me this 30th day of December 2025.

KIMMY VASQUEZ
Notary Public - California
Riverside County
Commission # 2451234
My Comm. Expires Jun 22, 2027

Notary Public in and for
County of Riverside, CA

My commission expires:
June 22, 2027