UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 25-3605 JGB (SPx)** | Date | April 27, 2026 |
|---|---|---|---|
| Title | ***Pechanga Band of Indians v. Robert F. Kennedy, Jr., et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Myra Ponce |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Lloyd B. Miller, Robert R. Yoder, Whitney A. Leonard | Alexander Layne Farrell |

**Proceedings:    Order: (1) DENYING Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 58)**

Before the Court is Plaintiff Pechanga Band of Indians's ("Pechanga" or "Plaintiff") motion for a preliminary injunction. ("Motion," Dkt. No. 58.) After considering the papers filed in support of and in opposition to the Motion, along with the parties' statements at oral argument on April 27, 2026, the Court **DENIES** the Motion.

## I.    BACKGROUND

On December 31, 2025, Plaintiff filed a complaint against Defendants Robert F. Kennedy, Jr. in his capacity as the Secretary of the United States Department of Health and Human Services; Clayton Fulton, in his capacity as the chief of staff for the United States Indian Health Service ("IHS"); Beverly Miller in her capacity as the area directory for the California Area IHS; and Wesley Simmons in his capacity as area lead negotiator for the California Area IHS ("Defendants" or "IHS" or "the Government". ("Complaint," Dkt. No. 1.) On March 24, 2026, Plaintiff filed the instant Motion. (Mot.) Defendants filed their opposition on April 6, 2026. ("Opposition," Dkt. No. 59.) Plaintiff replied on April 13, 2026. ("Reply," Dkt. No. 60.) The Court held oral argument on the Motion on April 27, 2026.
//
//
//
//

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG
Time: 00:40

## II.  FACTS

### A.  The Indian Self-Determination and Education Assistance Act

The Indian Self-Determination and Education Assistance Act ("ISDA"), passed in 1975, authorizes IHS to enter into self-governance compacts ("Title V compacts") with Indian tribes to operate healthcare programs for the benefit of the tribal community.  See generally 25 U.S.C. §§ 5301-5423.  Under such compacts, a tribe steps into IHS's shoes to serve IHS beneficiaries and receive the federal funds the agency otherwise would spend on such services.  See 25 U.S.C. §§ §§ 5381-5399.  Per the statute, "[t]he Secretary shall negotiate and enter into a written compact with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States."  25 U.S.C. § 5384(a).  The statute also provides for the same with respect to funding agreements.  See 25 U.S.C. § 5385(a).  Such funding agreements "shall . . . authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding . . . for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of Indians because of their status as Indians."  25 U.S.C. § 5385(b)(1).  Further, "[w]hen an Indian tribe . . . partially withdraws from a participating inter-tribal consortium[,] . . .  the withdrawing Indian tribe . . . shall be entitled to its tribal share of funds supporting those programs, services, functions, or activities (or portions thereof) that the Indian tribe will be carrying out under its own . . . compact and funding agreement."  25 U.S.C. § 5386(g)(2).

Where a tribe and IHS cannot agree on the terms of a compact or funding agreement, the tribe may submit a final offer letter to the Secretary.  25 U.S.C. § 5387(b).  After a 45-day review period, if the Secretary wishes to reject the offer, the Secretary must provide the tribe with:

> [A] timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that—
>> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
>> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title . . . .

25 U.S.C. § 5387(c)(1)(A).  "In the absence of a timely rejection of the offer, in whole or in part, made in compliance with [the above section], the offer shall be deemed agreed to by the Secretary."  25 U.S.C. § 5387(b).

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG
Time: 00:40

The statute also confers jurisdiction upon this Court over any civil action against the Secretary "for money damages arising under contracts authorized by this chapter." 25 U.S.C. § 5331(a). In addition to money damages, the Court may order "injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter . . . , or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter . . . (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract)." Id. In such a proceeding, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the [final] offer." 25 U.S.C. § 5387(d).

## B. Pechanga's Proposed Compact

After experiencing multiple tribal member deaths due to opioid addiction and overdose, Pechanga decided to establish an opioid treatment program to provide services for its own members and other Indians in the area. (Mot. at 5-6.) Pechanga is a member of the Riverside-San Bernardino County Indian Health, Inc. ("Riverside"), a consortium of nine federal recognized tribes that provides health care services to IHS beneficiaries. (Id. at 6.) The Riverside compact has existed since 2004. (Opp'n at 8.) That programming does not provide comprehensive opioid addiction treatment. (Mot. at 6.) It does provide alcohol and substance abuse treatment. (Opp'n at 8.) Plaintiff notes that Riverside supports the transfer of funds for the Pechanga program. (Mot. at 6.)

Pechanga seeks to enter into its own compact with IHS and transfer 2.5% of its existing share of IHS funds from Riverside to the tribe. (Id.) Pechanga would devote $12,644 of those funds annually to the proposed opioid treatment program. (Id.) IHS would not be required to provide any additional program funding. (Id.) In combination with these funds, Pechanga would devote several million of its own funds and anticipated insurance revenues to operating the clinic. (Id.) Pechanga would operate the program in conjunction with tribally-owned contractor OneTogether Solutions. (Id. at 7.) OneTogether Solutions has a track record of successfully operating other IHS-approved tribal opioid treatment facilities in the state. (Id.)

Pechanga began the compact proposal process in August 2023. (Id.) Pechanga negotiated with IHS through IHS Area Lead Negotiator Wesley Simmons. (Id.) IHS initially expressed no concerns regarding Pechanga's plans to serve both IHS beneficiaries and non-Indian patients at the proposed facility. (Id.) IHS has approved other tribal programs that serve non-Indian patients and generate revenues from that service that offset the cost of services to beneficiaries. (Id.) Pechanga initially proposed their partial withdrawal from Riverside would take place on February 1, 2024. (Opp'n at 9.) This proposal did not include operational specifics. (Id.) The parties met on September 13, 2023, and January 4, 2024, but Pechanga did not provide information IHS sought, including when they intended to withdraw from Riverside and open the clinic, or whether they would provide a draft ISDA agreement for IHS's review. (Id.)
//
//

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG
Time: 00:40

IHS assisted Pechanga with drafting a resolution authorizing Pechanga to serve non-Indian patients pursuant to section 813 of the Indian Health Care Improvement Act, 25 U.S.C. § 1680c(c)(2). (Mot. at 7.)  The parties also reached an agreement on the amount of funding Pechanga would withdraw from Riverside to form the base IHS funding for the compact. (Id.)  Simmons agreed to Pechanga's tribal resolution authorizing withdrawal of 2.5% of its existing IHS funding from Riverside to fund the new program. (Id.)

On August 15, 2024, Pechanga mentioned that they intended to subcontract with OneTogether to administer the program. (Id. at 9-10.)  By early October 2024, the parties had agreed on all material terms of the compact and were finalizing administrative details. (Id. at 8.)  There was a mutually agreed goal of opening the facility by February 2025. (Id.)  Based on IHS's representations that the compact was proceeding toward finalization, Pechanga invested more than $5.5 million in tribal funds into the project. (Id.)

Then, in mid-October 2024, IHS suddenly changed course and began asking Pechanga for information about its agreement with OneTogether Solutions. (Id.)  IHS demanded a copy of Pechanga's management contract with OneTogether. (Id.)  That contract was neither referenced in, nor directly relevant to, the compact. (Id.)  Pechanga did not address IHS's questions about the OneTogether contract. (Opp'n at 10.)  On November 19, 2024, the tribe provided a redacted copy of the agreement between Pechanga and OneTogether, and then several weeks later provided an unredacted copy. (Id.)  Pechanga requested technical assistance pursuant to 25 U.S.C. § 5387(c)(1)(B) and informed IHS it was willing to amend the OneTogether contract as necessary to address concerns. (Mot. at 8.)  IHS refused to provide any specific feedback on what Pechanga could do to address its concerns, and then unilaterally declared an impasse. (Id.)

On December 27, 2024, the parties met to negotiate and IHS informed Pechanga that their proposal did not appear to reflect a tribally administered program as required by ISDA. (Opp'n at 10.)  IHS informed Pechanga both that it was not clear the program was for Indians and that IHS had not been aware that OneTogether was operating clinics for other tribes at the time those compacts were entered into. (Id.)

On May 20, 2025, Pechanga sent IHS a final offer ("Final Offer") seeking approval of its proposed compact and the associated funding agreement. (Mot. at 8.)  On July 3, 2025, IHS rejected the final offer. (Id.)  IHS offered three reasons for its rejection: (1) the program would not sufficiently benefit Indian patients; (2) Pechanga requested too much federal program funding; and (3) the determination of what programs may be operated under the ISDA by tribes is an inherent federal function. (Id. at 9.)  Following IHS's rejection, Pechanga again requested technical assistance. (Id.)  The tribe also requested a Tribal Delegation Meeting between Pechanga's leadership and IHS Acting Director Smith, which occurred on September 30, 2025. (Id.)  No resolution was reached. (Id.)

IHS has paid Riverside for the provision of health care programs to Pechanga tribal members through January 31, 2027. (Opp'n at 12.)

### III. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). "When the government is a party, these last two factors merge." Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees, attorneys, and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d).

Courts in the Ninth Circuit may consider the Winter factors on a sliding scale and grant an injunction where the plaintiff raises "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff" if "the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (noting that the latter two elements are "the other two elements of the Winter test").

### IV.   DISCUSSION

**A.      Proper Standard for Issuing Preliminary Injunction**

As an initial matter, the parties disagree on the statutory scheme governing Plaintiff's request for a preliminary injunction. Plaintiff argues that the Court's authority arises under 25 U.S.C. § 5331(a). (Mot. at 19-19.) Section 5331 states that:

> [T]he district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a). Plaintiff reads the authorization to order "immediate injunctive relief to reverse a declination finding" as permitting preliminary injunctions involving such relief. (Mot. at 19.)

It is certainly true that "[t]he traditional requirements for equitable relief need not be satisfied [where a statute] expressly authorizes the issuance of an injunction." United States v. Est. Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000). But Plaintiff has offered no case where a preliminary injunction of the kind it seeks was imposed under the authority of Section 5331(a). In

Pyramid Lake Paiute Tribe v. Burwell, the court imposed an injunction absent normal equitable requirements at the summary judgment stage, not at the preliminary injunction stage.  70 F.Supp.3d 534, 545 (D.D.C. 2014.)  In Susanville Indian Rancheria v. Leavitt, the court imposed a preliminary injunction requiring adoption of a compact, but the compact contained the same language as a prior contract—which the court found to be the "status quo"—and the entry of an injunction of some kind was not opposed by the Government.  See 2:07-cv-259-GEB-DAD, Dkt. No. 28 (E.D.C.A. February 28, 2007.)

Those courts' actions are consistent with the statutory language at the permanent injunction stage or the equitable factors at the preliminary stage.  But neither supports ignoring the equitable factors at the preliminary stage where Plaintiff is asking for something other than protecting the status quo.  Nor does the language of Section 5331(a) necessarily support such an approach.  First, the statute is plainly discretionary.  The court "*may* order appropriate relief" but is not obligated to do so.  See 25 U.S.C. § 5331(a).  Second, the "immediate injunctive relief" referenced in the statute could just as well be interpreted as a later stage permanent injunction requiring immediate implementation of an improperly declined compact without any requirement, for example, that the parties try to continue negotiating first or that the Government may have some buffer time before implementation.  The statute does not plainly authorize the Court to grant immediate relief at the preliminary injunction stage, nor does the Court find that to be the appropriate approach.  It would serve neither Pechanga or IHS to preliminarily order entry into the compact only to risk that the case does not ultimately come out Pechanga's way and force the disruption of, or closure of, a clinic that has begun treating patients.  This risk exists even if the Court finds at this stage that Plaintiff is likely to succeed on the merits.

As such, the Court determines that Section 5331(a) is not the proper mechanism for evaluating Plaintiff's preliminary injunction request.  Rather, the Winter factors articulate the proper approach.  But where a party seeks a mandatory injunction—one that goes beyond maintaining the status quo—such injunctions are "particularly disfavored" and "the district court should deny such relief unless the facts and law clearly favor the moving party."  Stanley v. Univ. of S. California, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted).  Asking the Court to preliminarily require IHS to enter into the compact is a request for a mandatory injunction; the status quo is that there is no compact, and Plaintiff is seeking preliminary ratification of the proposed compact.  As such, Plaintiff must not just satisfy the typical Winter standard, but must satisfy the enhanced mandatory injunction standard.

## B. Enhanced Winter Analysis

### 1. Likelihood of Success on the Merits

"Likelihood of success on the merits is a threshold inquiry and is the most important factor."  Env't Prot. Info. Ctr. v. Carlson, 968 F.3d 985, 989 (9th Cir. 2020).
//
//

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk MG
Time: 00:40

### i. Legality of Final Offer

IHS's primary objection to the Final Offer is that, in IHS's estimation, the proposed compact is illegal.  (Declaration of Wesley Simmons ("Simmons Decl."), Dkt. No. 59-1, Ex. D ("Rejection Letter")).  Specifically, IHS believes that, because it has determined the "proposed clinic would overwhelmingly benefit non-Indians, rather than provide health services for the benefit of Indians because of their status as Indians as mandated by the [ISDA]," the program is beyond the scope of permissible compacting.  (Id. at 6.)

IHS's objection to the Final Offer on this basis is deficient for two reasons: (1) it is not a permissible basis for rejecting a final offer under Section 5387(c), and (2) even if it were, Pechanga's Final Offer is not an illegal basis for compacting.  First, Section 5387(c) is clear that there are only four possible bases for rejecting a final offer:

> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title . . . .

25 U.S.C. § 5387.  IHS's own Rejection Letter appears to acknowledge that this basis is not one of the four; after stating that it rejects the Final Offer because it is not a covered basis for compacting, IHS then writes, "In the alternative . . . ," and proceeds to discuss the enumerated bases for rejecting the offer.  (Rejection Letter at 9.)

Perhaps understanding that its primary reason for rejecting the Final Offer is beyond the statute, IHS argues that the Court lacks subject matter jurisdiction to even hear this case.  Specifically, IHS asserts that because Section 5331 provides jurisdiction to the Court over compact disputes between IHS and tribes "arising under this chapter," and it deems the Final Offer to be beyond the scope of the statute, it does not arise under this chapter.  (Opp'n at 15.)  IHS may be of the opinion that the Final Offer proposes a program beyond ISDA's scope, but it is not the final arbiter of that question.

It is the position of this Court that Plaintiff is likely to succeed on the merits of its argument that the Final Offer proposes a program that falls squarely within the bounds of ISDA, both conferring jurisdiction and negating this argument offered in the Rejection Letter.  First, consider IHS's attempt at analogy:  "if Pechanga were to propose as part of their request for OPTs, that they wanted to also operate a public bridge under the terms of an [ISDA] compact, then the IHS could reject that discretionary proposal to operate a bridge and that decision would

not fall subject to this court's review." (Id.)  It is obvious that such a bridge would fall outside the scope of ISDA's authorization for self-determination compacts to carry out IHS programming.  But Pechanga is not requesting allocation of funding to operate a public bridge. Pechanga is requesting allocation of funding to run an opioid treatment clinic that will benefit its own citizens, other Native Americans, and the general public.  Thus, regardless of whether this Court had jurisdiction over a compact that does not arise under the statute, this proposed compact does, and there is jurisdiction.

IHS's precise concern appears to be with its belief that the clinic is not intended to be for the benefit of Pechanga's members and that the funding cannot be used in a project that will benefit those ineligible for IHS services.  IHS asserts that "Pechanga is only entitled to compact under the [ISDA] to provide opioid treatment program services to its own members." (Id. at 17.) But Section 5385(b)(1) merely provides that, "[e]ach funding agreement . . . shall . . . authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding . . . for all programs, services, functions, and activities (*or portions thereof*), that are carried out for the benefit of Indians because of their status as Indians . . . ."  25 U.S.C. § 5385(b)(1) (emphasis added).  The statute explicitly acknowledges that some programs may be run only in part "for the benefit of Indians because of their status as Indians" and dictates that the funding received from IHS under a Title V compact must be used toward that portion of the program.  This makes a lot of sense, because the very next section of the statute states that "[s]uch programs, services, functions, or activities (or portions thereof) include all programs, services, functions, activities (or portions thereof) . . . with respect to which Indian tribes or Indians are primary or significant beneficiaries."  25 U.S.C. § 5383(b)(2).  This very language acknowledges that eligible Indians need not be the *only* beneficiaries of a program.  So long as they are "primary or significant beneficiaries," the program is entirely within the scope of Title V compacting.

Pechanga's Final Offer appears likely to satisfy this standard for several reasons.  First, Pechanga identified for IHS the substantial scope of the opioid addiction issue within its tribal community.  Pechanga provided data that, in the past five years, at least eight tribal members have died from opioid overdoses, along with another three individuals who are not confirmed. (Declaration of Robert Yoder ("Yoder Decl."), Dkt. No. 58-4, Ex. 2 ("Yoder Letter") at 1.) Further, in the six months leading up to the Yoder Letter, 14 tribal members received treatment for substance abuse and dependency, of which 11 were treated in Riverside and San Bernardino counties.  (Id. at 1-2.)  Yoder also provided data showing that in 2023 in Riverside County, there were 62 deaths per 100,000 residents for Native Americans/Alaska Natives, which far exceeded any other race or ethnicity.  (Id. at 2.)  In the Rejection Letter, IHS argued that because Pechanga's members represent only 0.03% of the population of Riverside County and because "it is unclear whether any of the [tribe's] members will choose to receive care at the proposed OTP," the proposed program is not carried out for Indians because of their status as Indians. (Rejection Letter at 7.)  But Section 5385 does not require that some threshold percentage of individuals living in the vicinity of the proposed clinic be tribal members in order to permit IHS funding.  And given the small size of Pechanga's membership in this region—984 individuals between Riverside, San Bernardino, San Diego, Orange, Los Angeles, and Imperial Counties— the eight members who have died from overdoses and the 14 members who have been in

treatment are not an insignificant portion of the community.  Just because the tribe's membership may be smaller does not mean it cannot compact to run a program itself.  Nor does the statute impose any requirement that the tribe must promise a certain number of tribal members will certainly use the program once it exists.

Second, at oral argument, Pechanga's counsel explained that none of the funds withdrawn from Riverside would be used to provide care to Indians who are not members of Pechanga under the Final Offer.  While the Government argued extensively that it is unlawful for Pechanga to enter into a compact for the benefit of members of other tribes or unaffiliated Indians in Riverside County because of the existence of Riverside, the Final Offer does not appear to propose such conduct.  The Final Offer does not propose to take money from Riverside for the purpose of providing care to Indians who are not Pechanga tribal members, so the caselaw the Government cites is irrelevant.  (Opp'n at 17.)

Third, the Final Offer is clear that "[i]neligible persons shall be billed for services when the Tribe determines (based on these considerations) that such services could otherwise result in a denial or diminution of health services to eligible Indians."  (Compl., Ex. A ("Compact of Self-Governance") at Art. II, Sec. 20.)  Thus, the Pechanga funds proposed to be transferred between the Riverside compact and the Final Offer program would not be used for ineligible persons unless there would be no reduction in services available to eligible Indians.  Given that Section 5385 contemplates that only a portion of a program may serve eligible Indians—and federal law explicitly authorizes the tribe to provide health services for ineligible individuals—the Final Offer appears to sufficiently ensure that compact funds will be used for eligible Indian patients.  See 25 U.S.C. § 5385(b)(1); 25 U.S.C. § 1680c(c)(2).

Additionally, the Final Offer notes that income obtained for treating ineligible individuals will be used consistent with federal law and treated as supplemental funding.  (See id. at Multi-Year Funding Agreement, Section 5.)  Pechanga argues, persuasively, that this means ineligible individuals' payments will allow it to provide *more* services for eligible patients than what the IHS funding alone might allow.

Finally, the Court notes that the cases Defendant cites are plainly distinguishable.  In Navajo Nation, which addressed a proposed Title I contract, the Government rejected a contract proposal for a tribe to apply for Temporary Assistance for Needy Families ("TANF") funds.  Navajo Nation v. Dep't of Health & Hum. Servs., Sec'y, 325 F.3d 1133, 1136 (9th Cir. 2003).  The Ninth Circuit agreed with the Government that TANF is not a program "for the benefit of Indians because of their status as Indians" that can be contracted for under the ISDA since because TANF "simply makes block grants available to the states as a funding mechanism rather than placing the federal government in the role of providing welfare services, TANF is not a federal program subject to contracting under the" ISDA.  Id. at 1137.  TANF is a program for the benefit of the general public, there is no component of it that exists for the specific purpose of supporting Indians.  To the contrary, providing health services, including opioid treatment, is *precisely* the kind of federal program IHS offers specifically for Indians and is subject to compacting under the ISDA.

Similarly, in Hoopa Valley Indian Tribe, the Ninth Circuit held that a river restoration project did not qualify for Title I contracting because "the Trinity River restoration program is not 'specifically targeted' to Indians, but rather is intended to benefit a far wider range of interests in the Trinity River and its fisheries." Hoopa Valley Indian Tribe v. Ryan, 415 F.3d 986, 991 (9th Cir. 2005). The unifying feature of these two cases is that the programs the tribes sough to contract for under Title I were programs that were general in scope, not specifically for Indians. It was the fundamental nature of the programs—TANF and a river restoration project—that made them ineligible for contracting, not what percentage of people served under the programs might be tribal members. Neither decision concerned a situation where the program to be contracted for was fundamentally of the nature IHS provides for the benefit of Indians because of their status as Indians, and is therefore available for compacting. Indeed, it is entirely possible that more tribal members may have benefitted from the Navajo Nation and Hoopa Valley Indian Tribe projects than may benefit from the program proposed in this case. But that is not a relevant consideration. Those cases were not about extent to which the programs benefitted tribes, they were about whether programs created by the Government were intended *by the Government* to be specifically targeted to tribal members or not. Navajo Nation and Hoopa Valley Indian Tribe say nothing about the instant situation, where the Government created IHS and its programs to specifically target tribal members, thereby making opioid treatment serving tribal members available for compacting.

As such, the Court finds Plaintiff is likely to succeed on the merits of its claim that the Final Offer is entirely lawful under ISDA, and therefore Defendant must have properly rejected the program under the bases articulated in Section 5387.

### ii. Other Bases for Rejection

In addition to IHS's argument that the Final Offer proposes an illegal compact, the Rejection Letter also purports to offer valid bases for IHS's refusal to compact. Those reasons appear unavailing.

First, IHS writes that the Final Offer is rejected under Section 5387(c)(1)(A)(i), because it will result in provision of an amount of funds that exceeds applicable funding levels. In support of that argument, IHS essentially rehashes its arguments about the extent to which the funds provided will be used to serve ineligible patients. (Rejection Letter at 10.) IHS repeatedly states that such "programs cannot be added to an [ISDA] agreement and any amounts sought for their operation under the [ISDA] are necessarily in excess of the applicable funding level." (Id.) The Court has already determined that Plaintiff is likely to succeed on the merits of its claim that the program is, in fact, for the benefit of Indians because of their status as Indians. And because Pechanga is only seeking funds that are already allocated to the tribe, there is no funding requested that is "in excess of the applicable funding level." (Id.) The money already belongs to Pechanga, the tribe simply wishes to change how it is being used.

IHS also argues in the letter that ISDA compacts carry with them a range of "financial benefits in addition to Secretarial funding, including [contract support costs], access to Federal

sources of supply (25 U.S.C. § 5324(k)), Federal Tort Claims Act ["FTCA"] coverage (25 U.S.C. 5321(c)), and the ability to bill at the IHS all-inclusive rate (AIR)," which the tribe cannot use because its proposal is illegal.  (Id.)  These "financial benefits" do not appear statutorily tied to the "applicable funding level" Section 5387 contemplates.  While they may hold monetary value, these benefits do not constitute funds because they are not cash transfers in and of themselves that are pre-allocated to the tribe.  In any event, the Court has found that the Final Offer is likely legal.

Second, IHS writes that the Final Offer is rejected because it fails under Section 5387(c)(1)(A)(ii), because "the determination of whether the program will be carried out for the benefit of Indians because of their status as Indians is an 'inherent Federal function that cannot legally be delegated' to the Tribe."  (Rejection Letter at 11.)  This argument is, frankly, ridiculous, and a willful misreading of the statute.  Section 5387 allows rejection where IHS clearly demonstrates that "the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe."  25 U.S.C. § 5387(c)(1)(A)(ii).  There is no reasonable, logical reading of this language other than as permitting IHS to reject a proposal where the proposed program itself is an inherent federal function.  It does not authorize IHS to sweep into the "inherent Federal function" the *decision* whether a program complies with another part of the statute.  The type of thing that may be deemed an inherent Federal functions in this context is the *provision* of a "program, function, service, or activity."

For the foregoing reasons, the Court finds that Plaintiff is likely to succeed on the merits of its claim that IHS unlawfully rejected the Final Offer.

**2. Irreparable Harm**

Plaintiff must demonstrate it is likely to suffer irreparable harm in the absence of a preliminary injunction.  See Winter, 555 U.S. at 20.  This is where Plaintiff's case falters.  The Court is of course cognizant of the ongoing opioid addiction crisis and the apparent need to provide treatment to Pechanga's members and others in the community.  But according to Pechanga's own general counsel, Steve Bodmer, "the Tribe has invested more than $6,600,363.00 of its own funds into the establishment of the proposed opioid treatment facility and program" and "the facility for the planned opioid treatment program is sitting unused."  (Declaration of Steve Bodmer ("Bodmer Decl."), Dkt. No. 58-5 ¶¶ 9-10.)  While the roughly $12,500 the tribe seeks is certainly money it would rather have than not, it is a miniscule fraction of the money the tribe has invested in the project, which appears essentially ready to begin operation but for the final detail of entering the compact.

It is hard to take seriously that this sum of money is the difference between opening the clinic and not opening the clinic.  Instead, it would appear that the real value to Pechanga lies in the non-funding benefits of a Title V compact, including the ability to bill at the all-inclusive rate and protections under the FTCA.  These benefits are certainly very valuable, and it is not unreasonable for the tribe to be so interested in obtaining them prior to opening.  But these are

---

**CIVIL MINUTES—GENERAL**           Initials of Deputy Clerk MG
Time: 00:40

administrative benefits flowing to the tribe as an operator of the clinic; the irreparable harm Plaintiff claims is the inability to provide opioid treatment. The tribe has not contended that it is *impossible* to operate the clinic without the funding and the benefits—doing so is simply less favorable. But that is not sufficiently weighty irreparable injury to satisfy the normal <u>Winter</u> standard, must less the elevated standard for a mandatory injunction.

This is further compounded by the tribe's delay in seeking a preliminary injunction. The tribe received the Rejection Letter on July 3, 2025, filed this case on December 31, 2025, and filed this Motion on March 24, 2026. (Opp'n at 20.) While the Court does not seek to punish the tribe for its efforts to resolve this case without litigation, there is no explanation for the delay between filing the case and filing the Motion. Given that the irreparable harm Plaintiff claims is the risk that its own citizens overdose, the Court expects a better explanation for why Plaintiff waited nearly three months to file.

Plaintiff has not demonstrated irreparable harm absent a preliminary injunction.

### 3. Public Interest & Balancing of Harms

Where the government is the opposing party, the balancing of the harm and the public interest merge. <u>See</u> <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. <u>Winter</u>, 555 U.S. at 24. Here, it would certainly benefit the public and Pechanga's members to have access to an opioid treatment program. At the same time, forcing IHS to enter into the Final Offer compact would permit the tribe to open the program not only with funding from IHS, but with the non-financial benefits compacting provides. While it might be simple enough to pay back the money should judgment ultimately be entered against Plaintiff, it would not be so simple to unwind the benefits. For example, if the tribe were to obtain valuable protection under the FTCA during the pendency of this case that the Court ultimately decides it is not entitled to, claimants might lose access to redress to which they would have otherwise been entitled to without a compact, or the tribe's liability exposure might suddenly change should the compact not endure. Further, the Court notes again that it has not been contended that it is *impossible* to open the program without the compact, it seems only less favorable to the tribe. Given the potential downsides to preliminary relief, the balance of the public interest and harm weighs against a preliminary injunction.

## V.    CONCLUSION

For the reasons described above, the Court **DENIES** the preliminary injunction.

**IT IS SO ORDERED.**