UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 25-3605 JGB (SPx)** | Date | July 1, 2026 |
|---|---|---|---|
| Title | ***Pechanga Band of Indians v. Robert F. Kennedy, Jr., et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**     **Order: (1) GRANTING Plaintiff's Motion for Summary Judgment (Dkt. No. 67); (2) DENYING Defendants' Application to File a Sur-Reply (Dkt. No. 84); and (3) VACATING the July 6, 2026, Hearing (IN CHAMBERS)**

Before the Court is Plaintiff Pechanga Band of Indians's ("Pechanga" or "the Tribe" or "Plaintiff") motion for summary judgment. ("Motion," Dkt. No. 67.) After considering the papers filed in support of and in opposition to the Motion, along with the parties' statements at oral argument on the preliminary injunction on April 27, 2026, the Court **GRANTS** the Motion.

## I.   BACKGROUND

### A.  Procedural History

On December 31, 2025, Plaintiff filed a complaint against Defendants Robert F. Kennedy, Jr. in his capacity as the Secretary of the United States Department of Health and Human Services; Clayton Fulton, in his capacity as the chief of staff for the United States Indian Health Service; Beverly Miller in her capacity as the area directory for the California Area IHS; and Wesley Simmons in his capacity as area lead negotiator for the California Area IHS ("Defendants" or "IHS" or "the Government"). ("Complaint," Dkt. No. 1.) On March 24, 2026, Plaintiff filed a motion for a preliminary injunction. ("PI Motion," Dkt. No. 58.) On April 27, 2026, the Court denied Plaintiff's PI Motion. ("PI Order," Dkt. No. 66.)

On May 5, 2026, Plaintiff filed the instant Motion.  (Mot.)  In support of the Motion, Plaintiff filed its Statement of Undisputed Facts.  ("Pl. SUF," Dkt. No. 67-2.)  On May 12, 2026, the Court continued the hearing on the Motion to June 22, 2026.  (Dkt. No. 71.)  On May 29, 2026, Defendants filed an ex parte application for extension of time to file a response to Plaintiff's Motion.  ("Application," Dkt. No. 72.)  Before the Court was able to issue an order regarding the Application, Defendants timely filed the Opposition on June 1, 2026.  ("Opposition," Dkt. No. 75.)  In support of the Opposition, Defendants filed:

- Declaration of Wesley Simmons and attached exhibits ("Simmons Decl.," Dkt. No. 74);
- Statement of Undisputed Material Facts ("Def. SUF," Dkt. No. 75-1 at 9); and
- Defendants' Response to the Pl. SUF ("Def. Resp.," Dkt. No. 75-1 at 1).

Plaintiff replied on June 8, 2026.  ("Reply," Dkt. No. 76.)  In support of the Reply, Plaintiff filed:

- Plaintiff's Response to the Def. SUF (Dkt. No. 76-1); and
- Plaintiff's Evidentiary Objections ("Pl. Obj.," Dkt. No. 76-2).

On June 12, 2026, Defendants filed an ex parte application for leave to file a sur-reply. ("Sur-Reply Application," Dkt. No. 84.)  The Court **DENIES** Defendants' Sur-Reply Application because it appears to simply restate arguments that were already made in Defendants' Opposition.  In any event, having reviewed the Sur-Reply Application and the proposed sur-reply, the arguments contained therein do not change the Court's position on the Motion.

## B.  The Indian Self-Determination and Education Assistance Act

The Indian Self-Determination and Education Assistance Act ("ISDA"), passed in 1975, authorizes IHS to enter into self-governance compacts ("Title V compacts") with Indian tribes to operate healthcare programs for the benefit of the tribal community.  See generally 25 U.S.C. §§ 5301-5423.  Under such compacts, a tribe steps into IHS's shoes to serve IHS beneficiaries and receive the federal funds the agency otherwise would spend on such services.  See 25 U.S.C. §§ 5381-5399.  Per the statute, "[t]he Secretary shall negotiate and enter into a written compact with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States."  25 U.S.C. § 5384(a).  The statute also provides for the same with respect to funding agreements.  See 25 U.S.C. § 5385(a).  Such funding agreements "shall . . . authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding . . . for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of Indians because of their status as Indians."  25 U.S.C. § 5385(b)(1).  Further, "[w]hen an Indian tribe . . . partially withdraws from a participating inter-tribal consortium[,] . . . the withdrawing Indian tribe . . . shall be entitled to its tribal share of funds supporting those programs, services, functions, or activities (or portions thereof) that the Indian tribe will be carrying out under its own . . . compact and funding agreement."  25 U.S.C. § 5386(g)(2).

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

Where a tribe and IHS cannot agree on the terms of a compact or funding agreement, the tribe may submit a final offer letter to the Secretary. 25 U.S.C. § 5387(b). After a 45-day review period, if the Secretary wishes to reject the offer, the Secretary must provide the tribe with:

> [A] timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that—
>> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
>> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title . . . .

25 U.S.C. § 5387(c)(1)(A). "In the absence of a timely rejection of the offer, in whole or in part, made in compliance with [the above section], the offer shall be deemed agreed to by the Secretary." 25 U.S.C. § 5387(b).

The statute also confers jurisdiction upon this Court over any civil action against the Secretary "for money damages arising under contracts authorized by this chapter." 25 U.S.C. § 5331(a). In addition to money damages, the Court may order "injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter . . . , or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter . . . (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract)." Id. In such a proceeding, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the [final] offer." 25 U.S.C. § 5387(d).

## II.  FACTS

### A.  Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. P. 56(e). For summary judgment, courts consider evidence with *content* that would be admissible at trial, even if the *form* of the evidence would not be admissible at trial. See, e.g.,
//
//
//

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

<u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003).  The Court considers the parties' objections only where necessary.[1]  All other objections are **OVERRULED AS MOOT**.

**B.  Undisputed Facts**

The following material facts are sufficiently supported by admissible evidence and are uncontroverted, except as noted.  They are "admitted to exist without controversy" for purposes of the Motion.  <u>See</u> Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

Pechanga is a federally recognized Indian tribe.  (Pl. SUF ¶ 1.)  Pechanga is a member of Riverside-San Bernardino County Indian Health, Inc. ("Riverside"), a consortium of federally recognized tribes that provides health care services to IHS beneficiaries.  (<u>Id.</u> ¶¶ 2-3.)  Pechanga Tribal Resolution 2004-0615 authorized Riverside to administer IHS programs on its behalf.  (Def. SUF ¶ 6.)  Riverside provides these services pursuant to a Title V compact under ISDA.  (Pl. SUF ¶ 4.)  Riverside administers alcohol, substance abuse, and mental health programs, along with Purchased/Referred Care ("PRC") programs, on behalf of its member tribes, including Pechanga.  (Def. SUF ¶ 3.)  Pechanga contracts under ISDA with other federal agencies, but does not have an ISDA contract or compact with IHS.  (<u>Id.</u> ¶ 5.)  Pechanga has faced an opioid crisis and many of its members are engaged in active opioid abuse and dependency.  (Pl. SUF ¶ 5.)

At some point in 2022[2], OneTogether Solutions gave Pechanga representatives a presentation regarding opioid treatment programs and explaining the establishment of an opioid treatment program.  (Def. SUF ¶ 7.)  The presentation modeled financial revenue from billing at the All-Inclusive Rate ("AIR"), which is the flat, per-visit payment rate paid to IHS and Tribal facilities by the Centers for Medicare & Medicaid Services per encounter.  (<u>Id.</u> ¶ 7; Pl. Resp. ¶ 7.)

On March 12, 2023, Pechanga's General Membership passed a resolution authorizing negotiations with IHS for an ISDA Title V compact to establish an opioid treatment program.  (<u>Id.</u> ¶ 6.)  On August 11, 2023, Pechanga initiated negotiations with IHS for a new Title V compact.  (<u>Id.</u> ¶ 8; Def. SUF ¶ 8.)  Pechanga proposed to withdraw a share of its funds from Riverside for the purpose of providing opioid treatment and certain PRC administrative services.  (Pl. SUF ¶ 9; Def. SUF ¶ 9.)  Between September 1, 2023, and January 4, 2024, the parties met and corresponded about Pechanga's proposal, but Pechanga did not provide information about when Pechanga intended to withdraw from Riverside or open the clinic.  (Def. SUF ¶ 10.)

---

[1] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are therefore "redundant" and unnecessary to consider here.  <u>Burch v. Regents of Univ. of California</u>, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

[2] Defendants assert that the presentation took place in August 2022, but Plaintiff notes that the presentation is dated April.  (Pl. Resp. ¶ 7.)

IHS received Pechanga's draft compact and funding agreement on March 7, 2024.  (Id. ¶ 11.)  The draft stated that the "Tribe will operate a clinic to provide addiction services and treatment to members of the Tribe as well as other Native Americans, and to non-Native patients including those served by Medicaid."  (Id. ¶ 12.)  The draft also stated that the "Tribe is authorized to provide health services to ineligible persons and to charge Indians and non-Indians for services in accordance with applicable federal law including 25 U.S.C. § 1680r(a) and 25 U.S.C. § 1680c."  (Id. ¶ 13.)  Pechanga identified the proposed program facility location in Perris, California.  (Id. ¶ 14.)  During negotiations between the parties, IHS asked about the facility location and operation information, the funds Pechanga sought to redirect from Riverside to Pechanga, and when Pechanga intended to begin providing services.  (Id. ¶ 15.)

On April 5, 2024, IHS provided technical assistance to Pechanga regarding their proposal to partially withdraw from Riverside.  (Id. ¶ 16.)  IHS also emailed about the relevance of a "Section 813" resolution from the Tribe confirming intent to serve non-Indian patients.  (Id.)  On April 23, 2026, Pechanga's Tribal Council adopted a resolution under 25 U.S.C. § 1680c(c) authorizing services to non-Indians at the proposed opioid treatment clinic.  (Id. ¶ 17; Pl. SUF ¶ 10.)  That resolution stated that Pechanga had "determined that services to non-Indian patients . . . will enable [Pechanga] to improve and expand health services to Indian patients."  (Pl. SUF ¶ 11.)

On May 23, 2024, IHS wrote to Pechanga about concerns with the draft agreement, including about language obligating the Tribe to bill Medicare, Medicaid, and other third-party payers, and about Pechanga's ability to build facilities outside of Riverside County and San Bernardino County.  (Def. SUF ¶¶ 18, 19.)  Pechanga proposed that the compact would have an effective date of February 1, 2025.  (Id. ¶ 20.)  On August 14, 2024, Pechanga sent Resolution 240815-1.1.D regarding the Tribe's partial withdrawal from Riverside.  (Id. ¶ 21.)  On August 15, 2024, the parties met and Pechanga sent IHS revised drafts of the proposed compact and funding agreement.  (Id.)  During this meeting, Pechanga for the first time mentioned that it was subcontracting with OneTogether Solutions for the administration of the proposed program.[3]  (Id. ¶ 24.)

On October 16, 2024, IHS requested Pechanga provide additional information, including financial information and a copy of its contract with OneTogether Solutions.  (Id. ¶ 28.)  On November 13, 2024, IHS informed Pechanga that IHS would need to review the contract with

_____

[3] Plaintiff inadequately disputes this fact.  (See "Standing Order," Dkt. No. 36, at 7 ("If a party fails to dispute a fact properly by offering evidence that does not contradict the proffered fact, the Court will deem the fact undisputed . . . .").)  Plaintiff contends that IHS had never previously asked about vendors the Tribe might use, and the Tribe was aware that IHS had already approved other tribal programs with OneTogether Solutions, so the Tribe did not believe the use of this vendor was relevant.  (Pl. Resp. ¶ 24.)  This statement may explain Pechanga's reasoning for not mentioning the involvement of OneTogether Solutions earlier, but it does not actually refute that the information was not shared sooner.  As such, this fact is deemed undisputed.

OneTogether Solutions before discussions could proceed.  (Id. ¶ 29.)  On November 19, 2024, Plaintiff shared a redacted copy of the agreement between Pechanga and OneTogether Solutions, followed by an unredacted copy supplied on December 5, 2024.  (Id. ¶¶ 30-31.)  On December 27, 2024, during a meeting between the parties, "IHS informed Pechanga that their proposal did not appear to reflect a tribally administered program as required by the [ISDA]."  (Id. ¶ 32.)  IHS also informed Pechanga that the "intended service population was not clear in that the program did not appear to be a program for Indians."  (Id. ¶ 33.)  IHS requested information about the number of IHS beneficiaries versus non-IHS beneficiaries Pechanga intended the program to serve.  (Id. ¶ 34.)

On January 2, 2025, IHS emailed Pechanga about the proposal, addressing topics including (1) that ISDA requires the proposed program to be conducted and administered by the Tribe; (2) that the program must be operated by the Tribe to receive 100% Federal Medical Assistance Percentage ("FMAP") and 340b program benefits; (3) ISDA's Indian preference requirements; and (4) that ISDA requires programs to be run for Indians because of their status as Indians.  (Id. ¶ 35.)  The third and fourth topics did not assert that Pechanga was not in compliance with these provisions, but rather sought information regarding compliance.[4] (Simmons Decl., Ex. 35; Pl. Resp. ¶ 35.)  On January 7, 2025, Pechanga provided the ownership information for OneTogether Solutions and provided written responses to IHS's concerns.  (Def. SUF ¶ 36.)  On January 22, 2025, IHS met with Pechanga to provide technical assistance.[5] (Id. ¶

---

[4] Plaintiff raises this information as a dispute, because the Def. SUF asserts that the email addressed "(3) non-compliance with the [ISDA]'s Indian Preference requirements, and (4) the program Pechanga proposed to withdraw from Riverside Consortium and authorize OneTogether Solutions to administer on its behalf was not a program for Indians because of their status as Indians as required by the [ISDA]." (Def. SUF ¶ 35.)  The Supreme Court has been clear that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  The Simmons Decl.'s description of the contents of Ex. 35 "is blatantly contradicted by the record," with respect to describing the email as addressing non-compliance with ISDA's Indian Preference requirements and the assertion that the proposed program was not a program for Indians because of their status as Indians, so the Court accepts Plaintiff's version, which is consistent with the contents of Ex. 35.

[5] The parties dispute whether "Pechanga appeared unwilling to administer the proposed program on its own behalf."  (Def. SUF ¶ 37.)  Defendants' only support for this assertion is that "Mr. Yoder stated the Tribe wanted to work with OneTogether Solutions and there was 'no requirement that the Tribe had to work with Indian enterprises.' Mr. Yoder requested that the IHS 'redline' edit the OneTogether Solutions MSA to enable OneTogether Solutions to administer the program. The IHS informed Pechanga that the IHS could not assist in the 'redline' editing of the MSA for Pechanga."  (Simmons Decl. ¶ 55.)  Pechanga counters—with support from the record—that the revised management services agreement ("MSA") with OneTogether Solutions expressly stated that the Tribe would be the sole owner of the clinic and (continued . . . )

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG

37.) In February 2025, the parties met to discuss the funding proposal. (Id. ¶ 38.) On March 7, 2025, IHS emailed Pechanga to explain its concerns, including its view that the MSA's inconsistent use of the term "assisting" Pechanga in the MSA reflected that OneTogether Solutions, rather than Pechanga, was to be "sole and exclusive provider" of clinic services. (Id. ¶ 40.) On March 18, 2025, Pechanga wrote to IHS with additional proposed changes to the MSA and to provide four presentations from OneTogether Solutions, along with market research information. (Id. ¶ 42.) The market research information noted that the "clinic would be open to all adults (native and non-native)." (Id.) On April 4, 2025, the Tribe sent an email to IHS explaining that 984 members lived in the counties around Riverside and San Bernardino counties, and that the communities to be served are less than 2% American Indian or Alaska Native ("AI/NA"). (Id. ¶ 43.)

IHS and Pechanga engaged in negotiations for nearly two years about the proposed compact. (Pl. SUF ¶ 12.) Pechanga provided IHS with data about tribal members' need for opioid addiction treatment services, including information that 14 members received treatment for substance abuse in the previous six months, and at least eight tribal members had passed away from opioid overdoses in the previous five years. (Id. ¶ 13.) In April 2025, IHS informed Pechanga that negotiations regarding the proposed compact had reached an impasse. (Id. ¶ 14.) Then, on May 20, 2025, Pechanga sent IHS a Final Offer with an attached Title V compact and funding agreement. (Id. ¶ 15; Compl., Ex. A.) In the Final Offer, Pechanga proposed to transfer 2.5% of its tribal share of IHS funding from Riverside to Pechanga to fund the new compact. (Pl. SUF ¶ 16.) Pechanga also explained that it planned to use revenue generated from billing third-party payers for services provided at the facility to fund the remainder of the proposed opioid treatment program.[6] (Id. ¶ 17.) The Final Offer referenced the Tribe's intent to serve its members, other Riverside patients, and others in need of opioid treatment. (Def. SUF ¶ 44.) The proposed compact stated that its effective date would be the earlier of either the date of approval by IHS or the date deemed approved pursuant to 25 U.S.C. § 5387(b). (Pl. SUF ¶ 18.)

On July 2, 2025, IHS received correspondence from the Tribe stating that IHS had "offered no clear path forward for a program receiving contracted assistance through Pechanga's choice of outside vendors, [OneTogether Solutions], other than to replace them with [Riverside]." (Def. SUF ¶ 45.) The proposed compact did not identify the services to be

---

would comply with all ISDA requirements. (Pl. Resp. ¶ 37.) A similar dispute is raised with respect to Def. SUF ¶ 39 and Pl. Resp. ¶ 39. While the parties have properly disputed these facts, resolution of these disputes is not material to the adjudication of this case.

[6] Defendants inadequately dispute this fact. (See "Standing Order," Dkt. No. 36, at 7.) Defendants assert that Pechanga sought to operate the clinic to provide addiction services to the Tribe's members, as well as other Native Americans, and to non-Native American patients including those served by Medicaid. (Def. Resp. ¶ 17; Simmons Decl., Ex. 50.) The fact asserted by Plaintiff—that it planned to use revenue generated from billing third-party payers—does not deny that non-Native Americans would be served at the clinic or otherwise conflict with that idea. Defendants' objection does not address the issue of third-party payers covering services at the facility. As such, this fact is deemed undisputed.

provided or the amounts to be paid by IHS.[7]  (Pl. SUF ¶ 20.)  The proposed funding agreement specified the services to be provided and the total annual amount to be paid by IHS.  (Id. ¶ 21.)  The proposed funding agreement stated that Pechanga would operate a clinic providing addiction treatment services to IHS beneficiaries and non-Native patients and provide administrative functions needed to coordinate PRC services.[8]  The total proposed annual funding amount was $20,770.  (Id. ¶ 23.)  Of that total, Pechanga proposed to use $12,644 annually for the proposed opioid treatment program.  (Id. ¶ 24.)

Pechanga attached the March 2023 General Membership resolution and the April 2024 § 1680(c) resolution to the Final Offer, along with other documents.  (Id. ¶ 25.)  On June 27, 2025, Riverside wrote IHS a letter expressing its support for Pechanga's proposed compact and the opioid treatment program specifically.  (Id. ¶ 26.)  IHS received the letter on July 2, 2025.  (Id. ¶ 27.)  Forty-five days from the date of submission of the Final Offer was July 4, 2025.  (Id. ¶ 19.)  On July 3, 2025, IHS issued a letter partially rejecting ("Rejection Letter") Pechanga's proposed compact and funding agreement.  (Id. ¶ 28.)  The Rejection Letter accepted Pechanga's proposal to assume a portion of the IHS PRC program, which is a program providing specialty medical care not provided by IHS or a tribal health care facility.  (Def. SUF ¶ 46.)  IHS has paid to Riverside Pechanga's full tribal share of IHS funds supporting health care services for Pechanga members through January 31, 2027.  (Pl. SUF ¶ 33.)

The Rejection Letter listed three reasons for IHS's rejection of the Final Offer.  (Id. ¶ 29.)  First, the letter stated that IHS had to "reject [Pechanga]'s proposal because it is not a program for the benefit of Indians because of their status as Indians, nor are Indian Tribes or America Indians or Alaska Natives the primary or significant beneficiaries. . . . Rather, [the opioid treatment] services will be provided primarily to the general public."  (Id. ¶ 30.)  Next, the Rejection Letter stated that the proposed compact violated 25 U.S.C. § 5387(c)(1)(A)(i) "because it will result in an amount of funds that exceeds the applicable funding level to which [Pechanga] is entitled."  (Id. ¶ 31.)  Finally, the Rejection Letter stated that the proposed compact violated 25 U.S.C. § 5387(c)(l)(A)(ii), because "the determination of whether the program will be carried out for the benefit of Indians because of their status as Indians is an 'inherent Federal function that cannot legally be delegated' to the Tribe."  (Id. ¶ 32.)

---

[7] Defendants inadequately dispute this fact.  (See "Standing Order," Dkt. No. 36, at 7.)  Defendants contend that Pechanga sought to open an opioid treatment clinic, which would be a type of "services."  That is true, however, the Tribe is correct that specific information about any such services or payments was not contained in the compact, but rather was outlined in the proposed funding agreement.  As such, this fact is deemed undisputed.

[8] Defendants inadequately dispute this fact.  (See "Standing Order," Dkt. No. 36, at 7.)  Defendants appear to raise a dispute about the legal significance of this fact given that it is Defendants' position that the program primarily benefits non-Indians.  Defendants' dispute with this fact is not factual, as in it does not contest what the proposed funding agreement said.  As such, this fact is deemed undisputed, as are all similar law-based disputes.

On August 13, 2025, IHS met with Pechanga to provide technical assistance. (Def. SUF ¶ 47.) Plaintiff's counsel communicated that the meeting "was not meaningful technical assistance" because he did not receive guidance on how Pechanga could 'continue to partner with OneTogether Solutions' to administer the clinic on its behalf." (Pl. Resp. ¶ 47.)

## III. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the nonmoving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The nonmoving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The nonmoving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the nonmoving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A. Standard of Review

The parties begin by disputing the standard of review the Court must use in order to evaluate IHS's Rejection Letter. Defendants suggest that the Administrative Procedure Act's ("APA") "arbitrary and capricious" standard is appropriate, while also recognizing that de novo review is used in cases challenging IHS's legal determinations under ISDA. (Opp'n at 9.) In Rancheria v. Hargan, the federal district court in Washington, D.C. noted that while another court within the district had previously applied the APA standard, other courts in that district

and elsewhere applied the de novo standard.  <u>See</u> 296 F. Supp. 3d 256, 264–65 (D.D.C. 2017).  Specifically, other courts had applied the de novo standard because ISDA's "text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of [ISDA] claims."  <u>Id.</u> at 265 (internal citations omitted).  Given the position of myriad other district courts and the fact that Plaintiff raises no APA claims in addition to its claim under ISDA, the Court determines that de novo review is the appropriate standard.

Defendants also contend that the Court "should consider evidence broader than just the administrative record of simply the final offer and the IHS's decision letter."  (Opp'n at 10.)  For this position, Defendants cite to <u>Fort McDermitt Paiute & Shoshone Tribe v. Price</u>, which emphasized the necessity of the court going beyond the bare administrative record where the extent of funding requested—and its compliance with ISDA's limits—was in dispute, and the record included financial spreadsheets with no explanations of what the numbers in the documents meant.  <u>See</u> 2018 WL 4637009, at *2 (D.D.C. Sept. 27, 2018).  But this case does not present "a lot of numbers" that the parties find "confusing."  (<u>Id.</u>)  Defendants have not suggested that there is anything in the administrative record that is unclear absent consideration of extrinsic evidence.  In any event, even if the Court considers the extra-administrative record materials submitted, such considerations do not change the Court's ultimate evaluation, which is directed toward the legal sufficiency of the Rejection Letter.

Under ISDA, IHS "shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer."  25 U.S.C. § 5387(d).

## B.  Whether the Final Offer Proposes an Illegal ISDA Compact

Having reviewed the undisputed facts in this case, and taking them in the light most favorable to Defendants, the Court finds no reason to deviate from its preliminary determination that IHS's Rejection Letter was an unlawful denial of the Final Offer.  (<u>See generally</u> PI Order.)  IHS continues to raise the same arguments previously presented and rejected: that Pechanga's proposal to provide health care programs to the general public are beyond IHS's authority to award compact funding under ISDA; that the Tribe's requested funding exceeds its entitlement; and that determining the scope of work an ISDA compact may cover is an inherent federal function reserved for IHS.  (<u>See generally</u> Opp'n.)

With respect to IHS's contention that the proposed compact is illegal, IHS's constricted reading of ISDA and the Tribe's authority under it does not comport with reality.  (Opp'n at 10-14.)  First, as the Court previously noted, this objection to the Final Offer is not a permissible basis for rejecting a final offer under Section 5387(c).  Section 5387(c) offers only four possible bases for rejecting a final offer:

(i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;

> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title . . . .

25 U.S.C. § 5387. IHS's position that the proposed compact is illegal is not one of these enumerated bases, defeating this argument outright.

But even if Defendants could validly challenge the Final Offer based on illegality, the Final Offer does not propose an illegal compact. An ISDA compact may:

> . . . authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding . . . for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of Indians because of their status as Indians . . . .

25 U.S.C. § 5385(b)(1). The statute further explains that such programs include those for which the Tribe or other Indians "are primary or significant beneficiaries." 25 U.S.C. § 5385(b)(2). Defendants make much of the fact that the majority of the people served by the clinic will be non-Indians. (Opp'n at 12.) But the statute does not impose an exclusively quantitative test. Even if the Tribe's members are not the numerically primary beneficiaries, if they are significant beneficiaries that is enough. Per Defendants' own undisputed facts, there are 984 Pechanga members living in the counties around Riverside and San Bernardino. (Def. SUF ¶ 43.) Per Plaintiff's undisputed facts, 14 tribal members obtained opioid treatment in the six months leading up to the Final Offer and at least eight members had passed away from opioid overdoses in the previous five years. (Pl. SUF ¶ 13.) For a tribe with fewer than 1,000 local members, that 14 received treatment in a recent six-month period and at least eight died in the past five years is significant. Further, the Tribe asserts and Defendants do not contest that the IHS funding would only be used for provision of services to Tribal members, which would indeed make them the numerically primary beneficiaries of the IHS funds, not just significant beneficiaries. (Reply at 5.)

Ultimately, these are human beings' lives at stake, and the Tribe has determined that a more focused and tailored approach to treatment for its members is critical. (Compl., Ex. A ("Final Offer Letter") at 2.) Defendants have not contested that opioid treatment is important to Pechanga and its members. Further, because the Tribe's goal is to expand access to quality treatment options for its members, this naturally suggests that even more members might receive treatment if the clinic were to exist. Pechanga should not be punished for having a numerically small membership that would be unable to sustain an entire clinic's operations on its own given that they have undisputedly demonstrated that there is need for treatment within their

---

community and opioid treatment is squarely within the purview of an ISDA compact.  (See Pl. SUF ¶ 13 (explaining that at least eight members have died from opioid use in the past five years).)  ISDA does not require that a tribe have some threshold number of members to be eligible to carry out an ISDA program.  Only allowing tribes to enter into ISDA compacts if they make up a certain percentage of the local population who might receive benefits from a tribally compacted program, or if their own membership is sufficiently substantial to make up the entire clientele of a program, is contrary to the explicit purpose of Title V compacting, which is self-determination.  This is especially the case when Section 5385(b) is considered in conjunction with 25 U.S.C. § 1680c, which it must be.

Under Section 1680c, in an ISDA compact, "the governing body of the Indian tribe . . . providing health services under such . . . compact is authorized to determine whether health services should be provided under such . . . compact to individuals who are not eligible for such health services under any other subsection of this section or under any other provision of law."  25 U.S.C. § 1680c(c)(2).  A tribe is obligated to consider whether "the provision of such health services will not result in a denial or diminution of health services to eligible Indians."  25 U.S.C. § 1680c(c)(1)(B).  In line with these statutory requirements, the proposed compact is clear that:

> The Tribe may elect to provide health care services to ineligible persons on a fee for service basis in accordance with the requirements of 25 U.SC. § 1680c, and in doing so "shall take into account the consideration described in [25 U.S.C. Section 1680c(c)] paragraph (1)(B)."  Ineligible persons shall be billed for services when the Tribe determines (based on these considerations) that such services could otherwise result in a denial or diminution of health services to eligible Indians.

(Final Offer at 22.)  Thus, the proposed compact binds the Tribe to use the requested funds only in a manner consistent with federal statutes, including the requirement that such funds cannot be used in any manner that diminishes or denies eligible Indians access to services provided by the funds.  Moreover, the Tribe intends to use proceeds from the treatment of non-eligible individuals to improve the overall services of the clinic, which benefits Tribe members, as demonstrated by the proposed compact's reference to using all program income and third party revenue in line with 25 U.S.C. § 1641.  (Id. at 23.)

Defendants raise several cases in support of their belief that the Final Offer proposes an illegal compact, none of which are persuasive.  Defendants' reliance on Mashantucket Pequot Tribal Nation, Appellant, DAB 2028 (2006) (H.H.S. May 3, 2006) ("MPTN") is misplaced.  (Opp'n at 13-14.)  In MPTN, the Departmental Appeals Board ("DAB") of the Department of Health and Human Services rejected a tribe's proposal to provide pharmacy services under an existing ISDA contract to non-Indian members of the tribe's health plan.  (Id.)  The case dealt with a prior version of the Indian Health Care Improvement Act's ("IHCIA") Section 813(b)(1)(A-B).  (Id.)  At the time, Section 813 provided that:
//
//

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

(A) The Secretary is authorized to provide health services under this subsection through health facilities operated directly by the services to individuals who reside within the service area of a service unit and who are not eligible for such health services under any other subsection of this section or under any other provision of law if-

(i) the Indian tribe . . . served by each service unit requests such provision of health services to such individuals, and

(ii) the Secretary and the Indian tribe have jointly determined that-

(I) the provision of such health services will not result in a denial or diminution of health services to eligible Indians, and

**(II) there is no reasonable alternative health facility or services, within or without the service area of such service unit, available to meet the health needs of such individuals.**

(B) In the case of health facilities operated under a contract entered into under the Indian Self-Determination Act [25 U.S.C. §450f et seq.], the governing body of the Indian tribe or tribal organization providing health services under such contract is authorized to determine whether health services should be provided under such contract to individuals who are not eligible for such health services under any other subsection of this section or any other provision of law. In making such determinations, the governing body of the Indian tribe or tribal organization shall take into account the considerations described in subparagraph (A)(ii).

Indian Health Amendments of 1992 § 813(b)(1)(A-B) (1992) (current version at 25 U.S.C. § 1680c) (emphasis added).  The critical decision in <u>MPTN</u> was that the tribe failed to comply with then-Section 813 because of the highlighted language above.  That language is no longer in the statute.  (<u>See</u> 25 U.S.C. § 1680c.)  Recognizing that the essential portion of the statute at issue in <u>MPTN</u> has been repealed, Defendants fixate on the DAB's assertion that:

Even if the Nation's failure to comply with section 813(b)(1)(B) were not dispositive here (which it is), additional circumstances demonstrate that the services for non-Indian employees included in the proposed AFAs are not properly the subject of a program which the Secretary is authorized to administer for the benefit of Indians:

- The Nation is not using any of its IHS funding to fund the services provided by PRxN, and the AFAs are purely a discretionary part of the Nation's ISDA contract. Thus, the principal reason for including the non-Indian employees under the contract is to enable the Nation to provide the employees with a fringe benefit at a discounted cost to the Nation through the use of the FSS, which is available only for services provided under the ISDA contract. . . .
- Even if there were some health care benefit to the tribal members from the inclusion of pharmacy services to non-Indian employees under the ISDA contract, it is vastly outweighed by the benefit to the non-Indian

employees since the number of tribal members is very small compared to the number of non-Indian employees.

MPTN at 6-7.  The "FSS" to which the DAB referred is the "Federal Supply Schedule" for commercial drug pricing, which offered the tribe a roughly 40% discount from managed care pricing.  The DAB objected to the tribe obtaining FSS pricing for prescription drugs provided to non-members of the tribe.  But as IHS conceded in MPTN, while FSS pricing could not be used to purchase pharmaceuticals for non-members if their coverage was not under an ISDA contract, using FSS pricing would be appropriate if the pharmacy services were covered by ISDA.  Id. Here, the provision of services to non-Indians *would* take place under an ISDA compact, consistent with the limitations on use of IHS funds for non-Indian patients.

With respect to the health care benefits to tribal members being outweighed by the benefits to non-member employees, that determination in MPTN was specifically reached in the context of a proposed contract important "to the Tribe's continued progress." Id. at 7.  That "progress," the DAB concluded, was the success of the casino operated by the tribe.  Id.  Thus, the DAB's position arose out of the conclusion that the purpose of trying to extend ISDA benefits to non-member prescription coverage was to advance the interests of the tribe's casino operations by reducing its health care costs for employees.  The tribe's pursuit of "continued progress" was not progress in provision of health care to members.

It is disingenuous—and unsupported by the record—to suggest that such a motive is at play here.  Pechanga is seeking funding to open an opioid treatment program to support its members—and others—who suffer from opioid addiction.  The purpose of this clinic is to treat addiction; financial benefits to the Tribe may exist, but there is no showing that they are anything other than secondary.  Beyond that, income from treating non-members at the proposed clinic must be used to advance health services for tribal members under the proposed compact.  (See Final Offer at 22.)  This is far different than a tribe trying to reduce the administrative costs of its casino operations in a manner only incidentally related to health care.

Jamestown S'Klallam Tribe v. Azar also does not counsel the conclusion Defendants advocate.  See 486 F. Supp. 3d 83 (D.D.C. 2020).  In Jamestown, IHS rejected a reimbursement request for costs related to a facility run by a tribe that served 97% non-Indian patients.  Id. at 84. The court there concluded that the tribe could not receive reimbursement from IHS for 100% of the lease compensation costs associated with the facility, because only a portion of the facility was used for IHS beneficiaries.  Id. at 85-86, 93.  But Jamestown actually supports Plaintiff's position here: The case *did not* raise any issues with the tribe's receipt of $1.6 million from IHS for provision of health services to tribe members at the facility even though it served 97% non-Indian patients.  Id. at 85.  IHS agreed to a compact for provision of a tribe's allocated funds to a health facility that treated an overwhelming majority of non-Indian patients, and took issue in Jamestown only with the provision of further funds that would be used not only for eligible patients, but also to cover costs associated with treating non-Indian patients.  Id.  It was the scope of the additional funding that posed a problem, not the general provision of funds to a facility

---

whose patients are a vast majority non-Indian, so long as the funds provided were used only for eligible patients.

The Court has already distinguished other cases Defendants once again cite in support of their position that the Final Offer does not propose a program for the benefit of Indians because of their status as Indians:

In Navajo Nation, which addressed a proposed Title I contract, the Government rejected a contract proposal for a tribe to apply for Temporary Assistance for Needy Families ("TANF") funds. Navajo Nation v. Dep't of Health & Hum. Servs., Sec'y, 325 F.3d 1133, 1136 (9th Cir. 2003). The Ninth Circuit agreed with the Government that TANF is not a program "for the benefit of Indians because of their status as Indians" that can be contracted for under the ISDA since because TANF "simply makes block grants available to the states as a funding mechanism rather than placing the federal government in the role of providing welfare services, TANF is not a federal program subject to contracting under the" ISDA. Id. at 1137. TANF is a program for the benefit of the general public, there is no component of it that exists for the specific purpose of supporting Indians. To the contrary, providing health services, including opioid treatment, is *precisely* the kind of federal program IHS offers specifically for Indians and is subject to compacting under the ISDA.

Similarly, in Hoopa Valley Indian Tribe, the Ninth Circuit held that a river restoration project did not qualify for Title I contracting because "the Trinity River restoration program is not 'specifically targeted' to Indians, but rather is intended to benefit a far wider range of interests in the Trinity River and its fisheries." Hoopa Valley Indian Tribe v. Ryan, 415 F.3d 986, 991 (9th Cir. 2005). The unifying feature of these two cases is that the programs the tribes sough to contract for under Title I were programs that were general in scope, not specifically for Indians. It was the fundamental nature of the programs—TANF and a river restoration project—that made them ineligible for contracting, not what percentage of people served under the programs might be tribal members. Neither decision concerned a situation where the program to be contracted for was fundamentally of the nature IHS provides for the benefit of Indians because of their status as Indians, and is therefore available for compacting. Indeed, it is entirely possible that more tribal members may have benefitted from the Navajo Nation and Hoopa Valley Indian Tribe projects than may benefit from the program proposed in this case. But that is not a relevant consideration. Those cases were not about extent to which the programs benefitted tribes, they were about whether programs created by the Government were intended *by the Government* to be specifically targeted to tribal members or not. Navajo Nation and Hoopa Valley Indian Tribe say nothing about the instant situation, where the Government created IHS and its programs to specifically target tribal members, thereby making opioid treatment serving tribal members available for compacting.

(PI Order at 9-10.)

Defendants also argue that "Pechanga does *not* have the right to enter into a compact with the IHS for the benefit of members of other tribes or unaffiliated Indians in Riverside County." (Opp'n at 16.) But Pechanga is not seeking to withdraw other tribes' or unaffiliated Indians' designated funding from Riverside to run a program on their behalf. Pechanga is seeking to withdraw its *own* funds from Riverside, not funds belonging to any other tribe or allocated for the benefit of unaffiliated Indians. To the extent Pechanga may choose to use a portion of those withdrawn funds to provide services to other tribes' members or unaffiliated Indians in addition to its own members, Defendants have pointed to no authority preventing Pechanga from doing so. Section 1680c only prohibits using IHS-provided funds in such a manner that results in "denial or diminution of health services to eligible Indians," not "denial or diminution of health services to a tribe's own members." 25 U.S.C. § 1680c(c)(1)(B). As discussed above, the compact is designed to ensure that non-eligible individuals will not receive the benefits of any IHS funds at the expense of Pechanga's members, and the provision of services to other tribal members or unaffiliated Indians using Pechanga's funds is seemingly within the discretion of the Tribe.

Further, even if the Tribe were prohibited from using the withdrawn funds for the benefit of any other tribes' members or unaffiliated Indians, Pechanga has represented that the funds will be used for its own members' care. (Reply at 4-5.) Defendant—even in the sur-reply—has not provided any facts contesting that assertion.

Ultimately, the Court once again determines that purported illegality is not a valid basis for rejecting the Final Offer under 25 U.S.C. § 5387. Moreover, even if that was a legitimate basis for rejecting a compact proposal, the Final Offer does not propose an illegal compact. The undisputed facts demonstrate that the Final Offer proposes an opioid treatment program for the benefit of Indians because of their status as Indians. Pechanga's members are at the very least significant—if not primary—beneficiaries of the proposed compact. To the extent the proposed compact provides services to non-eligible individuals, the Tribe properly considered and authorized such services consistent with 25 U.S.C. § 1680c(c), and the compact ensures that IHS-provided funds will not be improperly diverted to non-eligible individuals' care contrary to ISDA. As such, even taking the evidence in the light most favorable to Defendants, Defendants have plainly not carried the burden of demonstrating by clear and convincing evidence that this is a valid ground for rejecting the Final Offer.

## C. Whether Defendants Properly Rejected the Final Offer for Other Reasons

In addition to their unsuccessful argument that the Final Offer proposes an illegal compact, Defendants also argue that they validly rejected the proposal under 25 U.S.C. §§ 5387(c)(1)(A)(i) and (ii). (Opp'n at 15.) While Defendants entangle their analysis of these two provisions, the Court addresses them separately, and rejects both bases.
//
//

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

### 1. 25 U.S.C. § 5387(c)(1)(A)(i)

One valid basis for rejecting a proposed compact is that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter." 25 U.S.C. § 5387(c)(1)(A)(i). The Rejection Letter, along with the undisputed facts and Defendants' briefing, do not show by clear and convincing evidence that Defendants validly rejected the Final Offer on this basis.

Defendants appear to argue that the "applicable funding level" includes not only funding directly awarded by IHS, but also payments to the Tribe from Medicare, Medicaid, and other third-party payers.[9] (Opp'n at 15.) In support, Defendants cite to <u>Becerra v. San Carlos Apache Tribe</u> for the proposition that "funding includes not only the amount awarded directly by IHS, but also third-party funding that supports the Federal program." (<u>Id.</u>, citing 602 U.S. 222 (2024).) That is quite literally the opposite of what <u>San Carlos</u> says. <u>San Carlos</u> dealt with a tribe's eligibility to receive contract support costs incurred by the tribe when it began accepting payments from Medicare, Medicaid, and third-party payers under a Title I contract. Such payments from Medicare, Medicaid, and third-party payers are known as "program income." 602 U.S. at 228. In holding that IHS was obligated to pay contract support costs incurred by the tribe's receipt of program income, for example through the billing software used to collect payments, the Supreme Court was crystal clear that "[j]ust as third-party collections are not considered in determining IHS's appropriations, Congress has specified that a tribe's program income 'shall not be a basis for reducing' the Secretarial amount." <u>Id.</u> The "Secretarial amount" is the term of art used to refer to the amount of money IHS would have used to operate a program absent a contract or compact. <u>Id.</u> <u>San Carlos</u>'s conclusion is derived directly from statute:

> All Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement. . . . Such funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the program income is received or for any subsequent fiscal year.

25 U.S.C. § 5388(j).

The funding Pechanga seeks to have directly awarded by IHS as requested in the Final Offer—the Secretarial amount in this case—is $12,644 that already belongs to Pechanga. The money is simply currently directed toward another program from which Pechanga seeks to withdraw that funding. Pechanga's intention of accepting program income, even if the source of that income is from another federal program, has nothing to do with the "amount of funds" sought from IHS. Once again, Defendants willfully misread a statute in favor of an untenable position. (<u>See</u> PI Order at 11.)

---

[9] The Final Offer provides for Pechanga to collect funds from these sources through their provision of care to patients, including non-eligible patients. (Final Offer at 23.)

It also seems that Defendants argue that because they consider the proposed compact illegal because of the provision of services to non-eligible individuals, affording Federal Tort Claim Act ("FTCA") liability protections for such services "impermissibly expand[s] Congress' limited waiver of sovereign immunity." (Opp'n at 16.)  But as Plaintiff points out, the final sentence of 25 U.S.C. § 1680c(c)(2) explicitly provides for FTCA coverage for services provided to non-Indians under an ISDA compact.  See 25 U.S.C. § 1680c(c)(2).  Rather than contravene the limits of Congress' waiver of sovereign immunity, Congress *itself* has placed FTCA coverage for non-Indians within the ambit of ISDA compacting.

Defendants' justification for rejecting the Final Offer as exceeding the applicable funding level does not satisfy Section 5387(c)(1)(A)(i), and was an impermissible basis for rejecting the proposed compact.

### 2.  25 U.S.C. § 5387(c)(1)(A)(ii)

Defendants also appear to briefly rehash their argument that the Final Offer was properly rejected under Section 5387(c)(1)(A)(ii) because "the determination of whether the program will be carried out for the benefit of Indians because of their status as Indians is an 'inherent Federal function that cannot legally be delegated' to the Tribe." (Rejection Letter at 11; Opp'n at 11, 16.) The Court continues to find this argument entirely without merit and verging on frivolous.  The "inherent Federal function" provision in Section 5387 refers to the *nature* of a program, not to the *determination* of whether a function is inherently federal.  And the provision of opioid treatment programs to tribal members is certainly not an "inherent Federal function" that cannot be compacted for under ISDA; it is precisely the type of health care program the statute contemplates placing within the authority of a tribe to run itself using IHS funds.  As such, Defendants' rejection on this basis is also invalid.

### 3.  Relationship to Riverside Compact

Defendants raise, for the first time in their Opposition and not in the Rejection Letter, the argument that IHS cannot pay out funds to Pechanga under the proposed compact because Riverside has not amended its compact to release those funds.  (Opp'n at 21-22.)  This argument was not in the Rejection Letter, so it is not a proper basis for denying Pechanga's Motion.  In any event, this argument fails even on its own merits.  Defendants concede that Pechanga properly passed a withdrawal resolution for the funds it seeks to take from Riverside.  (Id. at 21.)  But Defendants argue that under 25 U.S.C. § 5325(b) and Pit River Health Serv., Inc., Appellant, DAB CR333 (1994) (H.H.S. Sept. 12, 1994), Defendants cannot unilaterally amend the Riverside compact or reduce its funding to provide those funds to Pechanga.  Neither purported legal basis supports this conclusion.

Pit River involved a tribe seeking to take over funding and responsibility for providing medical care to unaffiliated Indians whose care was already being provided for by another tribe through an ISDA compact.  Pit River, DAB CR333 at 4.  The rejection of the Pit River proposal stemmed from the Pit River tribe's pursuit of funding that did not belong to it, that would have

thereby impacted another tribe who was using that funding to provide services to others.  Id. at 13.  That is not the case here, where Pechanga seeks only its *own* funds from Riverside.  No other tribe's share of funding is impacted by the withdrawal of Pechanga's own funds.  Nor is Pechanga seeking a portion of another tribe's funding, or another tribe's use of funds allocated for unaffiliated Indians, to run its proposed clinic.

Further, 25 U.S.C. § 5325(b) authorizes a reduction in funds for an existing compact under precisely the basis satisfied here:

> The amount of funds required by subsection (a) of this section [for self-determination contracts]— . . .
> > (2) shall not be reduced by the Secretary in subsequent years except pursuant to—
>
> . . .
> > > (C) a tribal authorization[.]

25 U.S.C. § 5325(b)(2)(C).  Defendant has pointed to no statutory requirement that Riverside must provide further authorization or amend its compact in order for Pechanga to receive the funds directly once the Tribe has authorized the withdrawal.  As such, this too is an invalid basis for rejecting the Final Offer.

Having determined that Defendants did not properly reject the Final Offer under Section 5387, the Court **GRANTS** Plaintiff's Motion.

## V.   INJUNCTION

The Court must now fashion the appropriate relief.  Federal Rule of Civil Procedure 65(d) sets forth the requirements for issuing an injunction.  In order to issue an injunction, the Court must:

> (A) state the reasons why it issued;
> (B) state its terms specifically; and
> (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

Fed. R. Civ. Pro. 65(d)(1).

The parties dispute the proper remedy here.  Defendants argue that the Court should vacate the Rejection Letter and remand the Final Offer to IHS for limited further negotiations.  (Opp'n at 23-24.)  Defendant asserts that further negotiation is appropriate because "[a]s the evidence demonstrates, the parties can reach agreement" and should have a further chance to do so.  (Id. at 24.)  Defendants also assert that the Court "should reject Plaintiff's vision of relief that mandates entry into the Tribe's compact on their preferred terms of the Final Offer."  (Id. at 23.)  But that is precisely the relief 25 U.S.C. § 5331(a) authorizes, and for good reason: in the

event that a tribe makes a final offer that is not timely and properly rejected by the Secretary, Section 5387 explicitly directs that "the offer shall be deemed agreed to by the Secretary." 25 U.S.C. § 5387(b). Where, as here, the Secretary did not properly reject an offer, the precise design of the statute is for the *tribe's preferred terms* to become operative. This is a *feature*, not a bug, of the self-determination principles that underpin this statutory scheme.

On the other hand, Pechanga requests awarding the proposed compact and funding agreement as of July 4, 2025, 45 days after provision of the Final Offer without receipt of a statutorily compliant rejection letter. (Mot. at 23.) This would include payment of a portion of funds for fiscal year 2025 and all funds for fiscal year 2026. In the alternative, the Tribe asks that the funds requested be paid out as money damages under Section 5331.

Section 5331 directs in relevant part that:

> [T]he district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder.

25 U.S.C. § 5331(a).

Here, the Court is presented with a complicated situation where the funds sought by Pechanga are already committed to Riverside through the end of fiscal year 2026. Riverside, though it has expressed a willingness to reimburse the funds to IHS, is not a party to this case and the Court therefore cannot order Riverside to do anything. Further, while it may be true that IHS is a large agency with substantial annual lump sum allocations, the Court is concerned that requiring IHS to provide the funds for fiscal year 2026 and a portion of fiscal year of 2025 would result in Pechanga receiving funds in excess of the Tribe's allocation, because the money has already been paid out. This is not the Tribe's fault, nor does it undermine the Court's determination above that the compact and funding agreement do not under normal circumstances result in funding in excess of Pechanga's allotted amount, but provision of excessive funds would be a practical consequence of ordering the funds to be paid out specifically for 2025 and 2026.

The proposed compact and funding agreement include two key elements: the direct provision of funds from IHS, along with various non-monetary transfer benefits, including FTCA liability protections and the ability to bill at the all-inclusive rate. While the Court recognizes that the funds the Tribe seeks are not insignificant, there has been no evidence presented that the funds specifically are the difference between opening the facility immediately and being forced to keep it closed; it seems that opening the clinic without the non-monetary benefits of the proposed compact and funding agreement is far more difficult.

---

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

The Court therefore finds it most appropriate to order that the proposed compact and funding agreement be awarded to the Tribe effective immediately with respect to all provisions except the allocation of any funds from IHS for fiscal years 2025 and 2026. In order to prevent the duplication of payments on Pechanga's behalf that have already been made to Riverside for fiscal years 2025 and 2026, IHS's obligation to provide funds directly to Pechanga under the compact and funding agreement does not commence until the time at which IHS would normally disburse funds to compacting tribes and consortiums for fiscal year 2027. From that point on, IHS must award funds directly to Pechanga consistent with the compact and funding agreement. While this remedy does not perfectly satisfy the Tribe's request for relief, it is structured to provide a substantial portion of the benefits to which Pechanga is entitled under the compact and funding agreement, with the funding portions to become operative at the soonest possible point that there is no danger of duplicating funds provided to the Tribe.

The Court therefore **ORDERS** as follows:

(1) The Compact and Multi-Year Funding Agreement contained in Pechanga's final offer and attached to this order as Exhibit A and Exhibit B, respectively, are deemed agreed to by the Secretary as of the date of this order.

(2) All terms and provisions of the Compact and Multi-Year Funding Agreement are to take effect immediately upon publication of this order, with the exception of Compact Article II, Sections 2-3, and Multi-Year Funding Agreement Sections 6(a), 7, and 11 (together referred to as the "Excepted Sections").

(3) The Excepted Sections shall take effect no later than February 1, 2027, or at any earlier date as determined by the Secretary such that there is timely disbursal of funds under the Compact and Multi-Year Funding Agreement for fiscal year 2027.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion. The Court **DENIES** Defendants' request to file a sur-reply. The Court **ENTERS** the above injunction. The July 6, 2026, hearing is **VACATED**. Judgement shall issue accordingly, and the Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED.**